No. 23-10073

[ORAL ARGUMENT NOT YET SCHEDULED]

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

IVAN JIMENEZ, *et al.*,

*Plaintiff-Appellants*,

v.

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendant-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
No. 19-21546-cv-DPG (Darrin P. Gayles, J.)

_____

**APPELLANTS' OPENING BRIEF**

_____

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff-Appellants*

**U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT (CIP)**

Jiménez _____ *vs.* DHS _____ Appeal No. 23-10073

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed.  Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.**  In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

*(please type or print legibly)*:

Bahr, David A.

Department of Homeland Security

Department of State

Eggleston, Jill A.

Fajardo Orshan, Hon. Ariana

Gayles, Hon. Darrin P.

Gonzalez, Juan Antonio

Holzer, James V. M. L.

Immigration and Customs Enforcement

Jiménez, Iván

Rev.: 12/20

Jiménez v. DHS, No. 23-10073

Knopf, Andrew Franklin

Lapointe, Markenzy

Machado, Juan

Matzkin, Daniel

McClanahan, Kelly B.

Muñoz, José

National Security Counselors, Inc.

Office of Biometric Identity Management

Otazo-Reyes, Hon. Alicia M.

Panuccio, Brittany

Paul Knopf Bigger PLLC

Perez, Karina

Pineiro, Fernando

Raurell, Carlos

Rubio, Lisa Tobin

Stein, Eric F.

United States Citizenship and Immigration Services

Vásquez, Miguel

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellants Iván Jiménez, Juan Machado, José Muñoz, and Miguel Vásquez respectfully request oral argument.

This case presents numerous questions of law, from fundamental procedural issues which have never been heretofore litigated, such as whether the Government's filings in a Freedom of Information Act case must adhere to the same Federal Rules of Evidence as every other type of filing in every other type of case, to statutory interpretation issues about which courts across the country are split. The procedural history of this case is complex and the interplay between all of the different issues is intricate, and Appellants respectfully maintain that oral argument will allow the Court to more effectively parse all the interrelated issues and cut through the generalized arguments the Government has heretofore employed to obscure and conflate the matters in controversy.

## TABLE OF CONTENTS

STATEMENT OF ISSUES.................................................................1

STATEMENT OF THE CASE .........................................................2

    Factual and Procedural Background.......................................2

    Standard of Review................................................................6

SUMMARY OF ARGUMENT .......................................................7

ARGUMENT ...................................................................................8

    I.     REQUEST CORRESPONDENCE MUST BE FILED ..............8

    II.    APPELLANTS OVERCAME THE PRESUMPTION OF GOOD FAITH IN THE HOLZER AND PINEIRO DECLARATIONS..18

    III.   DHS SHOULD HAVE CONDUCTED AN ALIEN NUMBER SEARCH ...................................................................................27

    IV.   DHS WAS REQUIRED TO REFER REQUESTS TO CBP .......30

    V.    PROPRIETY OF CLAIMED EXEMPTIONS ...........................39

        A.    THE RECOMMENDATION IMPROPERLY CONSTRUED THE INA § 222(F) EXEMPTION...........39

        B.    THE RECOMMENDATION FAILED TO ACKNOWLEDGE SIGNIFICANT PROBLEMS WITH THE SECOND STEIN DECLARATION.........................50

    VI.   THE FORESEEABLE HARM STANDARD MUST BE ADDRESSED............................................................................53

CONCLUSION .............................................................................55

## <u>TABLE OF CITATIONS</u>

**Cases:**                                                        **Pages**

*Advisory Op. to the Governor Re: Implementation of Amendment 4, the Voting Restoration Amendment*, 288 So. 3d 1070 (Fla. 2020) ............... 45

*Andrews v. Warden*, 958 F.3d 1072 (11th Cir. 2020) ..................................... 47

*Barnett v. State*, 303 So. 3d 508 (Fla. 2020) .................................................. 46

*Center for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90 (D.D.C. 2019) ......................................................................................... 53, 54

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ....................................... 48

*Cortes v. American Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999) ......…….. 7, 10

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ...........................… 41, 49

*\*El Badrawi v. DHS*, 583 F. Supp. 2d 285 (D. Conn. 2008) ........................... 43

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) ....................................... 48

*EPA v. Mink*, 410 U.S. 73 (1973) .................................................................... 41

*Fla. Dep't of Health v. Florigrown, LLC*, No. 19-1464, 2021 Fla. LEXIS 843 (Fla. May 27, 2021) ............................................................................... 46

*Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n*, 489 So. 2d 1118 (Fla. 1986) ..................................................................................................... 46

*Guerra v. United States*, No. 09-1027, 2010 U.S. Dist. LEXIS 132999 (W.D. Wa. Dec. 15, 2010) .................................................................... 42

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ................................................. 41

*Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942 (Fla. 2020) ............ 46

*Jones v. DeSantis*, 462 F. Supp. 3d 1196 (N.D. Fla. 2020) ............................. 47

*Khatchadourian v. DIA*, 453 F. Supp. 3d 54 (D.D.C. 2020)...............…26, 27

*\*Kidd v. Mando Am. Corp.*, 731 F.3d 1196 (11th Cir. 2013)..........................16

*Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453 (5th Cir. 2005) ..................34

*Kowalczyk v. DOJ*, 73 F.3d 386 (D.C. Cir. 1996)............................................30

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) ................................6

*Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503 (Fla. 2008)....................46

*Machado Amadis v. Dep't of State*, 971 F.3d 364 (D.C. Cir. 2020).......…53, 54

*\*Mantilla v. Dep't of State*, No. 12-21109, 2012 U.S. Dist. LEXIS 136152 (S.D. Fla. Sept. 24, 2012).......................................................................42

*Massachusetts v. Dep't of Health & Human Servs.*, 727 F. Supp. 35 (D. Mass. 1989) ...................................................................................................44

*Maynard v. CIA*, 986 F.2d 547 (1st Cir. 1993)................................................29

*Medina-Hincapie v. Dep't of State*, 700 F.2d 737 (D.C. Cir. 1983)................42

*Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537 (11th Cir. 1990) ...................................................................................................43

*\*Morton v. Ruiz*, 415 U.S. 199 (1974)..............................................................33

*\*News-Press v. DHS*, 489 F.3d 1173 (11th Cir. 2007) ....................................41

*Nat'l Security Counselors v. CIA*, 960 F. Supp. 2d 101 (D.D.C. 2013) ...........38

*Page v. Deutsche Bank Tr. Co. Ams.*, 308 So. 3d 953 (Fla. 2020)...........…46, 47

*Plante v. Fla. Commission on Ethics*, 354 So. 2d 87 (Fla. 1st Dist. Ct. App. 1977) ...................................................................................................46

*Pleus v. Crist*, 14 So. 3d 941 (Fla. 2009).........................................................46

*Randall v. Loftsgaarden*, 478 U.S. 647 (1986) ................................................48

*Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021) ................................................................54

*Rosenberg v. DOD*, 342 F. Supp. 3d 62 (D.D.C. 2018) ..................................53

*Rowell v. BellSouth Corp.*, 433 F.3d 794 (11th Cir. 2005) .............................16

*Scott v. IRS*, No. 18-81750, 2021 U.S. Dist. LEXIS 14061 (S.D. Fla. Jan. 26, 2021) .................................................................53

*Spadaro v. CBP*, 978 F.3d 34 (2d Cir. 2020) ........................................43, 44

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003) .........................................33

*Stone v. INS*, 514 U.S. 386 (1995) ..................................................................54

*Thai Meditation Ass'n of Ala., Inc., v. City of Mobile*, 980 F.3d 821 (11th Cir. 2020) ................................................................47

*United States ex rel. Accardi v. Shaugnessy*, 347 U.S. 260 (1954) .................33

*United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94 (D.D.C. 2002) ................................................................43

*United States v. Aldrich*, 566 F.3d 976 (11th Cir. 2009) .................................48

*United States v. Frediani*, 790 F.3d 1196 (11th Cir. 2015) .............................47

*United States v. Navarro,* No. 22-2292, 2023 U.S. Dist. LEXIS 39872 (D.D.C. Mar. 9, 2023) ................................................................11

*United States v. Tigua*, 963 F.3d 1138 (11th Cir. 2020) ..................................47

*Weisberg v. DOJ*, 705 F.2d 1344 (D.C. Cir. 1983) ..................................28, 29

*Woronec v. Zachry Indus.*, No. 18-2244, 2021 U.S. Dist. LEXIS 27772 (M.D. Fla. Feb. 12, 2021) ................................................................................47

**Statutes and Rules:**

5 U.S.C. § 552 ...............................................….............10, 35, 39, 53

*6 C.F.R. § 5.4.................................................................4, 30, 33

8 U.S.C. § 1202 .............................................….40, 42

28 C.F.R. § 0.24........................................................................9

80 Fed. Reg. 45101 (July 29, 2015) ...........................................36

Fed. R. Civ. P. 56.....................................................................16

*Fed. R. Evid. 1002 .............................................…..5, 10

Fed. R. Evid. 1101 ..................................................................9

Pub. L. 108-458, 118 Stat. 3638...........................................…42, 43

**Legislative History:**

153 Cong. Rec. S10988 (Aug. 3, 2007)......................................38

H.R. Rep. No. 391, 114th Cong., 2d Sess. (2016) ...........................53

S. Rep. No. 4, 114th Cong., 1st Sess. (2015)..................................53

**Other Authoritative Sources:**

Abbe R. Gluck, *Intersystemic Statutory Interpretation: Methodology as "Law" and the* Erie *Doctrine*, 120 Yale L.J. 1898 (2011).................................48

Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation*, 119 Yale L.J. 1750 (2010) ...........................................................48

*Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...............................................…….41, 45, 47

Joseph Story, *Commentaries on the Constitution of the United States* (1833) .45

Oliver W. Holmes, Jr., *The Common Law* (1945) ...........................................44

## JURISDICTIONAL STATEMENT

Appellants Iván Jiménez, Juan Machado ("Machado"), José Muñoz ("Muñoz"), and Miguel Vásquez ("Vásquez") invoked the District Court's jurisdiction against the Department of Homeland Security ("DHS") and Department of State ("State") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and 28 U.S.C. § 1331. On 3 November 2022, the Honorable Darrin P. Gayles ("the District Court") issued a Final Order dismissing the case. DE 103 at 2. Appellants timely filed their Notice of Appeal on 2 January 2023. DE 104. This Court has jurisdiction over Appellants' appeal from the District Court's final judgment pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the District Court erred as a matter of law in holding that DHS did not have to file copies of FOIA correspondence on the record when seeking summary judgment regarding the FOIA requests at issue in Counts 1, 2, 4, and 5?

2.      Whether the District Court erred as a matter of fact and law in holding that Appellants failed to refute the presumption of good faith regarding the Holzer and Pineiro declarations, DE 29-1 and 54-1?

3.      Whether the District Court erred as a matter of fact and law in holding that Appellees performed adequate searches for records responsive to the FOIA requests at issue in Counts 1, 2, 4, and 5?

4.      Whether the District Court erred as a matter of law in holding that DHS, acting on behalf of its Office of Biometric Identity Management ("OBIM"), was not required to route the FOIA requests at issue in Counts 1 and 2 to Customs and Border Protection ("CBP")?

5.      Whether the District Court erred as a matter of fact and law in finding that Appellees properly withheld information from the FOIA requests at issue in Counts 1, 2, 4, 7, 8, and 10?

6.      Whether the District Court erred as a matter of law in failing to address the question of whether Appellees released all reasonably segregable information?

## STATEMENT OF THE CASE

Appellants sued Appellees in response to the agencies' failure to properly process their FOIA requests for information about the revocations or cancellations of their visas. The questions before the Court all arose in the context of Appellees' motion for summary judgment, in which Appellants argued that DHS was required to file copies of the relevant FOIA correspondence with its declarations, that they had overcome the presumption of good faith regarding two declarations filed by DHS declarants, that DHS had failed to prove that its components performed adequate searches (including because it failed to follow its own regulations), and that DHS and State had failed to prove that their withholdings under Exemptions (b)(3) and (b)(5) were proper.

### Factual and Procedural Background

1.      Appellants submitted two FOIA requests to OBIM for "all information located in the Automated Biometric Identification System ("IDENT"), Arrival Departure Information System ("ADIS"), and other OBIM systems about" Machado and Muñoz. These FOIA requests are the subject of Counts 1 and 2 of the Complaint. DE 1 at 3-5.

2.      Appellants submitted two requests to United States Citizenship and Immigration Services ("USCIS") for information about Machado and Muñoz. These FOIA requests are the subject of Counts 4 and 5 of the Complaint. DE 1 at 7-8.

3.      Appellants submitted three requests to State for information about Machado, Muñoz, and Vásquez. These FOIA requests are the subject of Counts 7, 8, and 10 of the Complaint. DE 1 at 9-13.

4.      DHS—on behalf of OBIM—located no records about Machado regarding Count 1. DHS stated that it could not search ADIS because that system belonged to CBP and directed Appellants to file a request with CBP for ADIS records. DE 29-1 at 3-4.

5.      DHS—on behalf of OBIM—located records about Muñoz regarding Count 2, which it released in part. It withheld information pursuant to, *inter alia*, Exemption (b)(3). DE 29-1 at 4. DHS stated that it could not search ADIS because that system belonged to CBP and directed Appellants to file a request with CBP for ADIS records. DE 29-1 at 3-4.

6.      The ADIS system belonged to OBIM until 18 January 2014, when it was transferred to CBP. *See* DHS, *Arrival and Departure Information System— Information Sharing Update*, at 2 n.1 (Mar. 7, 2014), *available at*

https://www.dhs.gov/sites/default/files/publications/privacy-pia-cpb-adis-update-20140305.pdf (last accessed Sept. 8, 2023).

7.     6 C.F.R. § 5.4(c) states, "Where a component's FOIA office determines that a request was misdirected within DHS, the receiving component's FOIA office shall route the request to the FOIA office of the proper component(s)."

8.     USCIS located records about Machado regarding Count 4, which it released in part. DE 66-1 at 4. It withheld information pursuant to, *inter alia*, Exemption (b)(3). DE 66-1 at 5-6.

9.     USCIS located no records about Muñoz regarding Count 5. DE 66-1 at 4.

10.    State located records about Machado, Muñoz, and Vásquez regarding Counts 7, 8, and 10, which it released in part. It withheld information pursuant to, *inter alia*, Exemptions (b)(3) and (b)(5). DE 29-3 at 4-6, 8-9.

11.    Appellants initiated this action in the Southern District of Florida against Appellees in 2019. DE 1.

12.    On 7 October 2020, Appellees filed a motion for summary judgment. DE 29.

13.    Appellees filed the Declaration of James Holzer to support summary judgment regarding DHS's processing of Appellants' FOIA requests. DE 17-1.

14.    Appellees did not file any correspondence exchanged between DHS FOIA officers and Appellants or their agents with the Holzer Declaration.

15.    Appellees filed the Declaration of Jill Eggleston to support summary judgment regarding USCIS's processing of Appellants' FOIA requests. DE 66-1.

16.    Appellees did not file any correspondence exchanged between USCIS FOIA officers and Appellants or their agents with the Eggleston Declaration.

17.    Appellants objected to the omission of request correspondence regarding these declarations pursuant to the Best Evidence Rule, Federal Rule of Evidence 1002. DE 61 at 5-8; DE 73 at 7.

18.    On 6 December 2021, after the parties completed briefing, the District Court referred the competing motions to Magistrate Judge Otazo-Reyes for a Report and Recommendation. DE 83.

19.    On 9 February 2022, Judge Otazo-Reyes conducted a hearing. DE 91.

20.    At the hearing, Appellants stated that if Judge Otazo-Reyes overruled their Best Evidence objection, they would withdraw their objections to Appellees' invocation of Exemptions (b)(6), (b)(7)(C), and (b)(7)(E). DE 91 at 42.

21.    At the hearing, Appellants also stated that if Judge Otazo-Reyes overruled their Best Evidence objection, they would withdraw their objections to the adequacy of USCIS's searches. DE 91 at 27.

22.    On 24 February 2022, Judge Otazo-Reyes issued a Report and Recommendation ("the Recommendation") recommending that the District Court grant summary judgment to Appellees on all counts. DE 86.

23.    Because Judge Otazo-Reyes overruled Appellants' Best Evidence objection, the Recommendation did not address the adequacy of USCIS's searches or Exemptions (b)(6), (b)(7)(C), and (b)(7)(E). DE 86 at 11-13.

24.    On 14 April 2022, Appellants filed an Objection to the Recommendation. DE 99.

25.    On 3 November 2022, the District Court accepted the Recommendation and entered an order granting summary judgment to Appellees. DE 103.

26.    The District Court's order did not discuss any objections raised by Appellants. DE 103.

27.    On 2 January 2023, Appellants appealed the District Court's order. DE 104.

### Standard of Review

The Court reviews substantive FOIA decisions and questions of law *de novo*. *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). The Court reviews rulings on the admissibility of evidence for abuse of discretion, and evidentiary rulings will be overturned only if the moving party establishes that the

ruling resulted in a substantial prejudicial effect. *Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999). However, the Court should apply a *de novo* standard to the District Court's decision regarding the question of whether DHS was required to file copies of the relevant FOIA correspondence on the record, since DHS's failure to do so caused it to fail to satisfy its burden of proof, even if the District Court did not err by overruling Appellants' Best Evidence objection. The District Court's conclusion that FOIA declarations are not subject to the Best Evidence rule is additionally a conclusion of law warranting *de novo* review and not an evidentiary ruling subject to the abuse of discretion standard.

## SUMMARY OF ARGUMENT

Both the Federal Rules of Civil Procedure and the Federal Rules of Evidence require that FOIA correspondence must be filed with agency declarations supporting a motion for summary judgment if those declarations seek to characterize the correspondence. Even if that infirmity was overcome, the Holzer and Pineiro declarations are no longer entitled to the presumption of good faith. Because of these two problems, as well as DHS's failure to follow its own referral regulation and its refusal to conduct a search using Machado's alien number, the District Court erred when it concluded that DHS had met its burden of showing that it had performed adequate searches for records responsive to Counts 1, 2, 4, and 5. The District Court also erred when it misapplied § 222(f) of the Immigration

and Nationality Act to information about visa revocations and cancellations and

concluded that Appellees had properly withheld information under Exemption

(b)(3). The District Court also erred in concluding that State had met its burden of

showing that it had properly withheld information responsive to Count 8. Lastly,

the District Court erred in not adjudicating the question of whether Appellees had

released all reasonably segregable information.

## ARGUMENT

Appellants seek reversal of the District Court's judgment of 3 November

2022. Appellants will discuss the two threshold issues which affect numerous other

arguments first, before addressing the other, more particularized issues.

## I.    REQUEST CORRESPONDENCE MUST BE FILED

The first threshold issue that the Recommendation discussed[1] is whether

DHS and USCIS needed to file the relevant FOIA correspondence on the record.

As Appellants explained, the correspondence related to the requests at issue

involved multiple different lawyers over several years. DE 73 at 19. Meanwhile,

Appellees not only were in the *best possible position* to have and to file this

correspondence together, but this attachment of correspondence is done as a matter

---

[1] Because the District Court's order accepting Judge Otazo-Reyes's
Recommendation did not address any of Appellants' objections, Appellants will
cite to the Recommendation herein for all findings and holdings that it should
reverse, since the District Court incorporated them by reference.

of course in virtually *every* other FOIA case the undersigned has litigated. This is unsurprising, given that the Department of Justice ("DOJ") explicitly trains attorneys defending agencies in FOIA cases to do so. DE 61-2; DE 61-3.[2] But the Best Evidence Rule is another clear and binding reason.

The Best Evidence Rule, Federal Rule of Evidence 1002, is a *requirement*, not a suggestion, and it applies equally to *all federal litigation*. *See* Fed. R. Evid. 1101 (rules apply "to the United States district courts" "to civil actions and proceedings," except in certain matters, none of which are FOIA cases). It unambiguously states that "[a]n original writing, recording, or photograph is

---

[2] The Recommendation's dismissal of the training materials as "irrelevant given that DOJ is not involved in this case," DE 86 at 10, is perplexing, since it is uncontested that an Assistant United States Attorney employed by DOJ was the only counsel of record for Appellees. To the extent that Judge Otazo-Reyes was arguing that DOJ's absence *as a party* was pertinent, it is not, since the training in question was for *DOJ attorneys who litigate FOIA cases*. The fact that DOJ explicitly instructs attorneys such as Appellees' counsel that the filing of correspondence is required directly refutes Appellees' arguments—as made by a DOJ attorney—that it is not. If Appellees' counsel disagree with this interpretation, they should take it up with the Office of Information Policy, which provided the training in addition to setting governmentwide FOIA policy and providing legal interpretations of FOIA in the name of the U.S. Attorney General. *See* 28 C.F.R. § 0.24(a)-(d). However, given that Appellees' former counsel himself filed the necessary correspondence to support both the Stein and Pineiro Declarations in this case, DE 29-4, DE 59-4, DE 59-5, DE 59-6, as well as in other cases before the District Court, *see* Thompson Decl. Exs., Dkt. #40-2, *passim* (filed Feb. 19, 2019), *Price v. NSA*, No. 17-24440 (DPG) (S.D. Fla.) (all FOIA correspondence attached to agency declaration by Assistant U.S. Attorney Carlos Raurell), Appellees' refusal to do so for the Holzer and Eggleston Declarations does not appear to be based on a principled objection.

required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Most notably, it does not state "unless these rules, a federal statute, *or case law* provides otherwise," and there is no relevant mention of either declarations or affidavits in the FOIA statute, *see* 5 U.S.C. § 552 *passim*, and no mention of FOIA in the Federal Rules of Evidence. But the Recommendation entirely inverted this requirement and essentially concluded that because Appellants cannot point to a separate, identical provision *in FOIA itself*, the Rule does not apply to FOIA declarations, regardless of the contents: "Plaintiffs can point to no such requirement for agency declarations in the FOIA case law." DE 86 at 10. This holding—itself a "clear error of judgment" which "applies an incorrect legal standard," *Cortes*, 177 F.3d at 1306—echoes the meritless assertion made by Appellees' counsel in the motion hearing: "[Appellants' counsel] cites in his papers the Federal Rules of Evidence about the Best Evidence. Well, those don't apply here." DE 91 at 49.

Focusing on only FOIA case law, when no agency appears to have ever taken such a needlessly contrarian position, is no different than taking the position recently discredited by Judge Kollar-Kotelly:

> [Defendant] argues that the [Plaintiff] cannot rely on [a statutory provision] because no court has yet interpreted it. If applied, this contention would render every new statute unenforceable because no court would ever be able to interpret it a first time absent another court's also-prohibited first interpretation. The circularity of such a novel doctrine is self-evident.

*United States v. Navarro*, No. 22-2292, 2023 U.S. Dist. LEXIS 39872, at *17-18 (D.D.C. Mar. 9, 2023) (citation omitted). And yet, despite the clear, unambiguous maxim that *all* of the Federal Rules of Evidence apply and that proffered evidence is only admissible if it satisfies *all* of them, Appellees instead fixate on hearsay, arguing, "There's a whole body of jurisprudence which we have referred to in our papers about the significance and the leeway that is given to declarants under FOIA to make statements on the basis of hearsay specifically." DE 91 at 49. This argument cannot be squared with the plain language of the Federal Rules of Evidence. If a party raises an objection to testimony based on a specific rule, the court cannot overrule it because a *different* rule does not apply.

Furthermore, this analysis completely missed the point of the Best Evidence Rule. Appellees are obviously trying to prove the contents of the FOIA correspondence by stating what the correspondence says, but they are doing so by summarizing cherry-picked information in declarations rather than by attaching the correspondence itself. The whole point of the Rule is that a party cannot do this and *must* attach the original documents unless an exception applies, and that the only place exceptions may be found are other rules and statutes. An exception does not apply here, so Appellees must attach original writings for the assertions regarding the correspondence's content to be admissible evidence. But the Recommendation claimed that because Appellants cited "no such requirement for

agency declarations in the FOIA case law," the Rule becomes inapplicable. As noted above, the Rule does not require special extension to be applicable.

To illustrate the extent to which Appellees sought to prove the contents of the FOIA correspondence, as well as the substantial prejudicial effect that the District Court's decision caused, Appellants will provide a brief recitation of the two most egregious examples.

On 7 October 2020, DHS Deputy Chief FOIA Officer James Holzer testified, "On November 14, 2018, Plaintiff Machado submitted a request to OBIM seeking information pertaining to himself in the Automated Biometric Identification System (IDENT), a records system maintained OBIM [sic] and the Arrival Departure Information System (ADIS)." DE 29-1 at 2. This testimony sought to prove the date this request was submitted to OBIM, and therefore the date DHS began processing it. In contrast, DHS's final response letter, dated 8 May 2019, stated, "This is the final response to your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), dated January 6, 2018, and received by this office on May 8, 2019." DE 75-1 at 1. Setting aside the inexplicable reference to the request being dated 6 January 2018, this letter—written by the declarant himself—stated that the office which processed the

request—DHS, not OBIM[3]—did not actually receive the request until 8 May 2019. This is a portion of the Holzer Declaration which misrepresents any part of the correspondence. If a court had to rely only on this declaration, it would never know that OBIM received the request in November 2018 but waited until a month after the complaint was filed to refer it to DHS, which then conducted the search, which had definite implications for DHS's argument that DHS did not know Machado's alien number. Simply put, the fact that DHS did not receive the request until May 2019—and more importantly, did not commence its search until May 2019—is potentially determinative if DHS learned Machado's alien number when he filed the lawsuit, but without that letter, a court would be under the misapprehension

---

[3] The exact nature of the relationship between OBIM and the DHS Privacy Office is unclear from the record. Holzer stated that the OBIM FOIA staff physically moved to the Privacy Office, where he was Deputy Chief FOIA Officer, in 2020. DE 29-1 at 2. He then explained that even though he was an official in the Privacy Office, he was submitting his declaration on behalf of OBIM because of "the arrangement the Privacy Office has made with OBIM" (*id.*), implying that *OBIM FOIA staff* and not Privacy Office staff continued to process requests submitted to OBIM. However, as noted above, Holzer claimed in a different letter that "this office"—namely, the office in which he was Deputy Chief FOIA Officer, which was not OBIM—did not receive the first Machado request until 8 May 2019. DE 75-1 at 1. Since OBIM moved to the Privacy Office in 2020 and Holzer apparently began submitting declarations on OBIM's behalf at approximately the same time, it is unclear why he was signing a letter dated 8 May 2019 referring to "this office" as a separate office to which it took six months to refer the request. Therefore, "DHS" will continue to be used herein to designate whichever office processed the FOIA requests in question, and the Court should not be confused by the different references in the parties' briefs.

that the agency had already been processing his request for five months by that time.

Similarly, while the second example pertains to Immigration and Customs Enforcement ("ICE") and not DHS, the exact chronology and content of agency correspondence is extraordinarily important to the question of whether the Declaration of Fernando Pineiro is entitled to a presumption of good faith, and it therefore demonstrates the reason that Rule 1002 must apply in such cases. Appellants' opposition to summary judgment contained a detailed timeline of events, DE 61 at 10-14, which will be summarized below, but the key takeaway from it was that there were *three* inconsistent ICE responses to Machado in February, June, and December 2020, DE 59-4, 59-5, and 59-6. The second and third responses, processed separately and undeniably with knowledge of this litigation, both withheld much more information than the first one did, and ICE only issued a fourth release in March 2021 to reconcile the differences after learning that Appellants would be holding these discrepancies against it. *See* DE 54-6 at 1 (records released "[u]pon litigation review" six days after status conference).

The first three releases show that this was not a minor difference between two random FOIA analysts, as ICE claimed, but rather significant differences between one analyst prior to the agency becoming aware of this litigation, and two

14

analysts after the agency became aware of the litigation. If this were truly a matter of which FOIA analyst processed the release, one would expect three different releases, the differences between which would not line up perfectly with this one significant change: knowledge of the litigation.

Bringing this back to Rule 1002, the Pineiro Declaration pointedly omitted the existence of the second response, apparently because it undermines the "difference of opinion" narrative. *Compare* DE 61-1 at 1 (June 2020 release letter), *with* DE 54-1 at 3 (referring to 2/18/20 and 12/30/20 releases as "the two productions [which] were not redacted the same" and omitting any mention of 6/9/20 release). ICE also attached copies of the first, third, and fourth release letters, DE 54-4, DE 54-5, DE 54-6, again completely omitting the existence of the second release. Then, ICE blatantly and repeatedly misrepresented through counsel that Appellants' counsel had knowingly deceived the Court in March 2020 about not receiving a response—when ICE had full knowledge that although it had processed the release prior to March 2020, that first release was not sent until April 2020. *Compare*, *e.g.*, DE 54 at 2 (claiming that "ICE first produced the records to [Appellants' counsel] in February 2020"), *with* DE 54-1 at 3 ("The final release letter was dated February 18, 2020. However, the letter was not emailed to the Plaintiffs until April 3, 2020."). This series of events further demonstrates the importance of agencies being required to file *all* the FOIA correspondence on the

record so that not only can plaintiffs fully corroborate such allegations, but so can a court. This is the reason that Rule 1002 exists, and there is no credible reason for an exception to be made for FOIA lawsuits.

The Recommendation appears to confuse this issue with the related question of what evidence may be considered at the summary judgment stage, and whether inadmissible evidence is *ever* allowed. The Recommendation correctly stated that hearsay is not outright barred in FOIA declarations, and that Appellants are not objecting to the declarations on that basis. DE 86 at 9. But the availability of *some* hearsay evidence in these declarations—which is allowed only because the declarant may not have, *e.g.*, performed the search themselves, but are still competent to serve as a declarant as to how the search was done because they have personal knowledge of it—does not mean that evidence does not have to be generally admissible to be considered at the summary judgment stage. Instead, on motions for summary judgment, "only that evidence which can be reduced to an admissible form" may be considered. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1207 (11th Cir. 2013) (quoting *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)).

Federal Rule of Civil Procedure 56(c) governs this issue more specifically. It provides at (c)(4) that a declaration used to support or oppose a motion must be made on personal knowledge, must set out facts that would be admissible in

16

evidence, and must show that the declarant is competent to testify on the matters stated. Meanwhile, (c)(2) provides that a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." And (d) provides that when a nonmovant shows it cannot present facts essential to justify its opposition, the court has discretion to remedy the situation.

The advisory committee's note to Rule 56(c)(2) provides that an objection under that provision "functions much as an objection at trial, adjusted for the pretrial setting . . . *The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated*." As the Recommendation correctly noted, FOIA cases are generally decided on summary judgment motions, not at trial. Therefore, since there is almost certainly not going to be a trial in this case, there is every reason to require that Appellees present the *only* form of this evidence that would be admissible at trial under the Best Evidence Rule, which is the correspondence itself. This is especially the case given the ease with which this could be done, contrasted with the Appellants having to show that they cannot present facts essential to justify their opposition without it.

Accordingly, the District Court's holding that DHS and USCIS were not required to file FOIA correspondence with the Holzer and Eggleston Declarations

17

was clearly wrong as a matter of law and should be reversed as an abuse of discretion. Furthermore, since all of the District Court's findings about Counts 1, 2, 4, and 5 were based on these declarations, they should all be vacated and the District Court should be ordered to issue new findings and holdings regarding those counts after requiring DHS and USCIS to file the relevant correspondence and allowing Appellants an opportunity to make new arguments about this new evidence, including any arguments pertaining to Exemptions (b)(6), (b)(7)(C), or (b)(7)(E).

## II.  APPELLANTS OVERCAME THE PRESUMPTION OF GOOD FAITH IN THE HOLZER AND PINEIRO DECLARATIONS

Agency declarations are accorded a presumption of good faith, but that presumption is rebuttable. In this instance, the Court should view the Holzer and Pineiro declarations skeptically without that presumption, due to the fact that both DHS and ICE withheld information it had previously released to Plaintiffs and defended those withholdings as justified by law, not to mention ICE's misconduct during this case.

DHS, for its part, withheld a significant amount of information from the request at issue in Count 2 that it had released to Muñoz in 2013, citing Exemptions (b)(3), (b)(6), and (b)(7)(C) in defense of its withholdings. *Compare* DE 59-1 at 1-5 *with* DE 59-2 at 1-8. The difference between these two releases is stark, but the reason is apparent. When DHS processed the records the first time, it

had no reasonable expectation that Muñoz would litigate the matter, but when DHS processed the records the second time, it expected litigation, and so it chose to take a hardline approach, claiming exemptions which were not applicable. Even if the Court discounts the possibility that DHS anticipated litigation at the time it processed the 2019 release, it cannot discount that it knew of the litigation when it chose to defend those withholdings by describing under oath why the information must be withheld. Given that Holzer explicitly indicated his awareness of the previous request, DE 29-1 at 2 ("I make the statements herein based on my personal knowledge, as well as on information that I acquired while performing my official duties. . . . On May 17, 2013, Plaintiff Munoz submitted a request to OBIM for information pertaining to himself from IDENT and ADIS."), and yet chose to defend the later withholdings because "[t]he records withheld pertained to the issuance or refusal of visas or permits to enter the United States," DE 29-1 at 4, "these employees have privacy interests in not having information that could lead to their identification released to the public because, in the event their identities did become public, they could be subject to unwanted attention and harassment," DE 29-1 at 4-5, and "[t]he disclosure of this information could undermine DHS' efforts in this regard and could enable members of the public in evading such enforcement [and] . . . [a]ny further description of these codes would reveal the technique being employed," DE 29-1 at 5. These characterizations and vague allegations of harm,

which Defendants defend as being entitled to a presumption of good faith, can be readily seen to be hollow by reviewing the previous release, DE 59-1.

Accordingly, since the record shows that DHS patently exaggerated its claims regarding its withholdings *in a sworn declaration* signed by a witness who admitted that he knew better, the Holzer Declaration should be denied a presumption of good faith and all of Holzer's conclusory allegations should be rejected.[4]

ICE's declaration is undeserving of a presumption of good faith for a related reason, although due to the fact that ICE learned that Appellants were aware of the discrepancy before filing its belated declaration, it did not actually defend the later improper withholdings to this Court, choosing instead to chalk it up to a difference of opinion between two FOIA analysts. DE 54-1 at 3-4 ("ICE has a number of FOIA analysts and in the event that the same set of documents is processed by two different analysts, there can be differences in processing. While ICE FOIA makes every effort through training and supervision to ensure consistency in processing, it is inevitable and not surprising that two individuals will come to different

---

[4] To clarify, Appellants are not merely stating that DHS should be required to release the previously released material under the prior official disclosure doctrine. This would serve no purpose, since they already have that material. Appellants use this evidence of bad faith to demonstrate to the Court that, without the presumption of good faith, Holzer's conclusory allegations about *other* withholdings and the searches conducted for responsive records are *also* insufficient to warrant summary judgment.

conclusions regarding the application of exemptions to particular pieces of information."). However, even this defense does not present the whole story, and, as noted above, ICE's deliberate omission of the existence of an intervening response is sufficient to overcome the presumption of good faith.

The timeline surrounding ICE's responses is illustrative on this point:

- On 3 June 2018, Jiménez and Machado filed the request at issue in Count 4 with USCIS. DE 1 at 5.

- On 23 April 2019, Appellants filed this lawsuit. DE 1.

- On 2-3 May 2019, Appellants served Defendants and DOJ. DE 11.

- On 28 May 2019, USCIS referred 26 pages to ICE. DE 54-1 at 3. The referral letter made no mention of this litigation. DE 54-3.

- On 31 May 2019, USCIS informed Machado of the referral to ICE, making no mention of this litigation. DE 61-4.

- On 13 February 2020, ICE allegedly received this referral. DE 54-1 at 3. ICE gives no reason for this nine-month discrepancy, which occurred before the coronavirus emergency.

- On 18 February 2020, ICE completed processing the referred pages. DE 54-1 at 3. ICE determined to release the vast majority of responsive information. DE 59-4. ICE did not send this response to Appellants at this time. DE 54-1.

21

- On 4 March 2020, Appellees' counsel asked Appellants' counsel if he had received a response directly from ICE. Appellants' counsel accurately responded that he had not "received anything from anyone." DE 45 at 3.

- On 27 March 2020, Appellees informed the Court, "USCIS and the undersigned counsel have requested that ICE expedite its review of the material referred to it. As of this date, ICE has not yet completed processing the material referred to it." DE 45 at 3.

- On 3 April 2020, ICE sent the 18 February 2020 response to Appellants. DE 54-1 at 3.

- On 1 June 2020, Appellees' counsel again asked Appellants' counsel if he had received a response directly from ICE. Appellants' counsel mistakenly responded that he had not and asked for specific language to be placed in the 3d Joint Status Report. DE 45 at 3-4.

- On 9 June 2020, ICE issued its second response to Appellants, signed by a different FOIA officer than the first response. DE 61-1. Apparently under the mistaken impression that Appellants' counsel had not received the previous release, ICE withheld a significant amount of responsive information and only released 24 pages. DE 59-5.

- On 30 December 2020, ICE issued its third response to Appellants, signed by a different FOIA officer than the first and second responses. DE 54-1 at 3. ICE withheld the same information it had withheld from the second response. DE 59-6. However, the third response included the two pages missing from the second response, and one page bore different markings, *compare* DE 59-5 at 17 *with* DE 59-6 at 17, indicating that the pages were reviewed independently.

- On 15-16 February 2021, Appellants' counsel attempted to convince Appellees' counsel that the Government needed to file a declaration addressing the ICE withholdings. Appellees' counsel refused, stating that the referred records were "not agency records subject to your FOIA request to USCIS." DE 47-1.

- On 16 February 2021, Appellants' counsel posted on social media about the discrepancy between ICE's first and second responses. Appellees' counsel accused Appellants' counsel at that time and again in the 17 March 2021 status conference of attempting to mislead the District Court when he stated on 4 March 2020 and in the 2d Joint Status Report filed on 27 March 2020 that he had not received a response from ICE, even though ICE's first response was not sent until 3 April 2020—a fact known to ICE. *Compare* DE 45 at 3 (stating

that Appellants' counsel had received the records by 27 March 2020)
*with* DE 54-1 at 3 ("The final release letter was dated February 18,
2020. However, the letter was not emailed to the Plaintiffs until April
3, 2020.").

- On 23 March 2021, ICE issued its fourth response to Appellants—
  signed by a different FOIA officer than the first, second, and third
  responses—"in order to make consistent the withholdings asserted on
  the two previous productions." DE 54-1 at 3-4.

- On 26 March 2021, Appellees filed the Pineiro Declaration to
  ostensibly explain the discrepancy between ICE's first and third
  responses and justify the withholdings from the fourth response. DE
  54 at 2. The Pineiro Declaration treated the 30 December 2020
  response as the second response and made no mention of the 9 June
  2020 response, even though the Notice of Filing accompanying it
  explicitly referred to "26 pages of records ICE produced to Plaintiffs
  in June 2020." DE 54 at 1.

While long and convoluted, this recitation demonstrates the bad faith of ICE
in this matter. Pineiro argues that the massive discrepancy between the first and
second responses is due to a simple difference of opinion between two FOIA
officers, while in fact it was, at best, a difference in opinion between the first FOIA

analyst, on the one hand, and the second and third FOIA analysts, on the other. The only intervening event between the first and second responses appears to be ICE's awareness of this litigation, since there is no indication that it—or even USCIS— was aware of the litigation at the time the referral letter was sent. *See* DE 54-3 (not mentioning litigation); DE 61-4 at 2 (advising Plaintiffs of their administrative appeal rights, which disappear once a request enters litigation). Appellees convinced the District Court to accept the premise that *both* FOIA analysts who separately processed the same 26 pages after learning of this litigation coincidentally reached the same conclusion that a significant amount of objectively non-exempt information must be withheld pursuant to *several* exemptions, while the only FOIA analyst who was unaware of the litigation reached the opposite conclusion. This premise is far too weak to explain the discrepancies, especially when one takes into account that there was virtually no information withheld from the first response and released in the second and third responses; the alleged difference of opinion flowed only one way.

ICE further exacerbated its problems when it pointedly omitted the existence of the second response from the Pineiro Declaration, likely because that response did not fit the narrative of two FOIA analysts who simply "c[a]me to different conclusions regarding the application of exemptions to particular pieces of information." DE 54-1 at 4. However, it was ICE's final action in this matter which

25

made its bad faith fully apparent; it blatantly and repeatedly misrepresented through counsel that Appellants' counsel had knowingly deceived the District Court in March 2020 about not receiving a response with full knowledge that ICE had not sent its first response until April 2020, all in an attempt to exclude its processing of 26 pages from this Court's judicial review. This argument, coupled with ICE's *post hoc* rationalization of radically different responses by omitting critical information, is not good faith litigation. Accordingly, the Pineiro Declaration should be denied a presumption of good faith and Pineiro's conclusory allegations should be rejected.[5]

The District Court failed to acknowledge the gravity of the inconsistencies in both declarations, accepting the explanation that different FOIA analysts will produce different outcomes. To support this conclusion, it quoted *Khatchadourian v. DIA*: "an agency's 'inconsistent approach to the classification designations of

---

[5] While Appellants believe that *none* of Pineiro's allegations should be accorded a presumption of good faith, as an act of discretion they limited their challenge to the allegation that the information on page 3 of DE 59-7 is properly exempt under Exemption (b)(5) based on his conclusory assertion that the "withheld information . . . includes attorney notes, thoughts, questions, plans, preparation, and litigation strategy related to an active immigration case and contemplates future litigation," DE 54-1 at 5, which is little more than a recitation of the types of information typically exempt under the attorney work product privilege with an immigration bent. While Appellants do not separately discuss this withholding below, they do maintain that if the Court finds that the Pineiro Declaration is not entitled to a presumption of good faith, then it should also find that ICE failed to justify this withholding.

several records' does not support a finding of bad faith with respect to its supporting declarations." DE 86 at 11 (quoting 453 F. Supp. 3d 54, 79 (D.D.C. 2020)). But the rest of the quoted passage of *Khatchadourian*—which is omitted from the Recommendation—is equally important: "DIA's inconsistent approach to the classification designations of several records is not evidence of bad faith *because DIA has subsequently corrected any errors*." 453 F. Supp. 3d at 79 (emphasis added). Additionally, "[f]or the slide deck which DIA allegedly produced three times, each time with more redactions, the undersigned [magistrate judge being quoted by the court] concludes that one of the three records is not the same as the other two." *Id.* "For the two identical records with different redactions, the undersigned accepts DIA's explanation of 'human error.'" *Id.* Clearly, that is hardly the same situation as here, yet the Recommendation equated this case to it in recommending a finding of no bad faith by these Appellees and their declarants.

## III.   DHS SHOULD HAVE CONDUCTED AN ALIEN NUMBER SEARCH

Appellants' challenge to DHS's failure to conduct an alien number search regarding Count 1 is straightforward: Appellants contend that because DHS can search using both fingerprints and alien numbers, it should do both if a fingerprint search yields no responsive records in order to ensure responsive records are located. DHS claims that a search with either will turn up the same records, but it has only provided the conclusory assertion that this is the case, rather than, *e.g.*, an

attestation that yes, as a technical fact, *every single* database entry the agency has contains *both* a valid, searchable fingerprint and an alien number. *See* DE 29-1 at 3-4. Appellants contend in response that unless this is the case, an adequate search would simply use both search methods, especially considering how easy it should be for DHS to obtain a requester's alien number (not to mention the fact noted above that by the time DHS began processing Machado's request for OBIM records, it was already in this litigation and well aware of Machado's alien number. *See* DE 29-1 at 5.)

Appellees' response amounts to "we don't have to and you can't make us"— even though *no records* were located for Machado, a Lawful Permanent Resident and visa holder who travels frequently to the United States and would surely have a record in the IDENT database. As Appellants' opposition to summary judgment explained, quoting *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983), this "inherently unbelievable" conclusion by the agency is "evidence that relevant records have not been released," which helps "shed light on whether the agency's search was indeed adequate." And "[i]f an agency fails to establish through reasonably detailed affidavits that its search was reasonable, the FOIA requester may avert summary judgment merely by showing that the agency might have discovered a responsive document had the agency conducted a reasonable search."

28

*Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993) (citing in part *Weisberg*, 705 F.2d at 1351).

The Recommendation noted that Appellants included fingerprint cards with their requests, but it omitted that this was done because OBIM *requires it*, instead implying that this was done because Appellants were requesting only a fingerprint search for their records. DE 86 at 12. As to Appellants' argument that DHS should have asked for Machado's alien number or obtained it elsewhere, the Recommendation stated that Appellants "point to no authority imposing this additional burden on OBIM, given that it was only accompanied by fingerprint cards." DE 86 at 12. But the necessary authority here is OBIM's *statutory requirement* to perform an adequate search. And especially given that the fingerprint cards were explicitly required as part of the requests, despite the fact that OBIM records can be searched by alien number, there is no reason that their submission can be deemed to limit OBIM's responsibility.

Regardless of what extra information a requester does or does not submit alongside an otherwise valid FOIA request, it is incumbent upon the agency to conduct a reasonable search, whatever that entails. Even more so when a reasonable search involves the agency obtaining relevant search information that it could easily obtain, this constitutes a "lead so apparent that the [agency] cannot in good faith fail to pursue it," as an agency cannot "ignore what it cannot help but

know." *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996). DHS's failure to conduct an alien number search, especially given the very high likelihood that at least one responsive record exists for Machado, renders its search inadequate. However, the Recommendation incorrectly suggested that there needs to be some clear and specific requirement that OBIM search with an alien number, which again boils down to an argument that agencies' responsibilities under FOIA are to be narrowly interpreted.

## IV.    DHS WAS REQUIRED TO REFER REQUESTS TO CBP

An agency's search must be found inadequate if the agency fails to abide by its own regulations. FOIA analysts in DHS and its components are bound by DHS's FOIA regulations, including 6 C.F.R. § 5.4(c)'s requirement that, "Where a component's FOIA office determines that a request was misdirected within DHS, the receiving component's FOIA office shall route the request to the FOIA office of the proper component(s)." This does not seem controversial—of course an agency component should make every effort to ensure FOIA requests end up in the right place.

Here, the requests in Counts 1 and 2 were to OBIM and related—in part but not in full, importantly—to the ADIS system, which was relocated from OBIM to CBP, another DHS component, in 2014. But when the requests for ADIS records arrived at OBIM, Appellees' position is that OBIM was under no obligation to

refer the requests to CBP, and that the requesters should re-file the requests with CBP themselves. This is in clear violation of the regulation quoted above, which requires referral.

Yet the Recommendation concluded that because Appellants' requests were only "partially misdirected" and Appellants argued that "referral" was appropriate, the "text of the regulation does not encompass 'partial misdirection' or require 'referral'; it addresses 'misdirection' and requires 'routing.'" DE 86 at 13. Therefore, because there is "no basis" for "imposing a referral duty" on OBIM under that regulation, the Recommendation concluded that the search was not inadequate. DE 86 at 13. That interpretation of the regulation makes no sense whatsoever. There is no good reason why part of a request being addressed to an agency component that does not maintain the relevant records system would not trigger this duty, whether one calls it a "duty to refer" or a "duty to route," and the Recommendation provided no explanation whatsoever for the asserted distinction between "partial" and "full" "misdirection" and between "referral" and "routing."

Agencies routinely break apart FOIA requests and refer parts to other components or agencies when appropriate, and there is no magic FOIA meaning to the terms "referral" and "routing" that would justify this conclusion. The regulation obviously requires referral when there is misdirection, but even more obviously so when the presumption of disclosure inherent to all FOIA litigation is

considered. Every FOIA-related action an agency takes should be done to ensure maximum disclosure, and referral of misdirected requests is clearly consistent with that.

Even aside from the FOIA purpose that the regulation is clearly designed to further, it would make no practical sense if there were some distinction between a "partially misdirected" request and one that is "fully" misdirected. If there were, and the referral duty only applied when the *entire* request was misdirected, the resulting outcomes would be absurd. A multi-part request where only one of many parts was *correctly* directed would mean the agency has no duty to refer the misdirected parts, even if there were, *e.g.*, 99 misdirected parts and only one correctly directed part. Meanwhile, if the same requester broke the multi-part request into 100 individual requests, then all 99 misdirected requests would be appropriately referred. This defies all logic, but the reasonable interpretation of "refer the misdirected parts and keep the correctly directed ones" is perfectly logical and normal as part of the FOIA framework.

As for the suggestion that there is some difference between "referral" and "routing," the only *possible* distinction would be if the Court were to interpret "routing" to mean forwarding the physical original copy of a request, but that interpretation is refuted by the regulation itself. It clearly states that if a component's FOIA office determines that a request was misdirected, "it shall route

32

the request to the FOIA office of the proper *component(s)*." 6 C.F.R. § 5.4(c) (emphasis added). The parenthetical "s" means that there may be more than one proper component, and it would be impossible to physically "route" a request to *two places*. Therefore, "route" must be understood to be a synonym of "refer," which renders the Recommendation's logic unsound.

This regulation obviously should apply here, and OBIM therefore was bound—not by FOIA itself, but by its own FOIA regulations—to route the requests to CBP. Federal agencies must "follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (citing *United States ex rel. Accardi v. Shaugnessy*, 347 U.S. 260 (1954)). *See also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required.").

At this point, it is necessary to address the through-line in all of DHS's arguments on this point, which is that the position that it is taking in this case is eminently reasonable and otherwise unremarkable. However, that argument does not bear up to close scrutiny when one considers the evidence of how DHS *actually* interpreted this regulation *before this case*. Therefore, Appellants will briefly summarize DHS's historical interpretation of this rule and what duty it

actually imposes, relying on official agency documents available on the agency's website, of which this Court should take judicial notice. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of information available on federal agency website).

- 2007 – The OPEN Government Act, Pub. L. 110-175, is signed into law. It adds the following language to FOIA: "The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency." 5 U.S.C. § 552(a)(6)(A)(ii).

- 2012 – The DHS Chief FOIA Officer issues an internal memorandum regarding, *inter alia*, "Processing 'Misdirected' FOIA Requests." *DHS Freedom of Information Act Policy Guidance: 1) Processing "Misdirected" FOIA Requests; and 2) Implementation of the Department of Justice Office of Information Policy (OIP) December 2011* OIP Guidance: Referrals, Consultations, and Coordination: Procedures for Processing Records When Another Agency or Entity Has an Interest in Them (Mar. 9, 2012) [hereinafter 2012 Memo], *available at* https://www.dhs.gov/sites/default/files/publications/dhs-foia-handling-guidance_1.pdf (last accessed Mar. 13, 2023). This memorandum includes several relevant statements:

- ○ It confirms that "5 U.S.C. § 552(a)(6)(A)(ii) . . . gives rise to the notion of 'misdirected requests.'" *Id.* at 1.

- ○ It defines a "misdirected request" as one where "the component that first receives a request may not have the records that are responsive to the request" without any qualifications. *Id.*

- ○ It states that "that component must forward the request to the another [sic] component (i.e., the 'appropriate component') for response." *Id.*

- ○ It states that "when a component receives a 'misdirected' FOIA request it is critical that the request be forwarded as quickly as possible to the responding component." *Id.* at 2.

- 2014 – The DHS Chief FOIA Officer issues an annual report. This report explains, "To promote efficiency, ICE implemented a new procedure for handling misdirected FOIA requests for the content of an individual's A-File. Instead of logging every request into ICE's system and then referring the request to USCIS individually, ICE now reroutes those requests to USCIS daily in bulk, and sends a postcard to the requester indicating the request has been rerouted. For requesters that continuously send ICE misdirected A-File requests, ICE contacts them personally and informs them of the fastest way to

35

get the records." DHS, *2014 Chief Freedom of Information Act Officer Report to the Attorney General of the United States* 45 (Mar. 2014) [hereinafter 2014 Chief FOIA Officer Rep.], *available at* https://www.dhs.gov/sites/default/files/publications/2014-chief-foia-officer-report-final_0_0.pdf (last accessed Mar. 13, 2023).

- 2015 – DHS issues the Proposed Rule which will become, in part, 6 C.F.R. § 5.4(c). It states that the new provision is designed "to advise requesters that a component that is in receipt of a misdirected request within DHS will redirect such a request to the proper component without the need for further action from the requester." 80 Fed. Reg. 45101, 45102 (July 29, 2015). It adds that "the component would inform the requester that DHS does not collect or retain the type of records requested" if "a component receives a request that should be directed outside DHS entirely." *Id.*

- 2016 – The DHS Chief FOIA Officer issues an annual report. This report responds to the question: "If your agency has a decentralized FOIA process, has your agency taken steps to make the routing of misdirected requests within your agency more efficient? If so, please describe those steps. If your agency is already handling the routing of misdirected requests in an efficient manner, please note that here and

describe your process for these requests." DHS, *2016 Chief Freedom of Information Act Officer Report to the Attorney General of the United States* 19 (Mar. 2016), *available at* https://www.dhs.gov/sites/default/files/publications/2016-chief-foia-officer-report-april-4-2016.pdf (last accessed Mar. 13, 2023). DHS responds to this prompt: "Yes. In 2012, the DHS Privacy Office issued a memorandum on processing misdirected requests, emphasizing the importance of routing misdirected requests to the appropriate Component as soon as possible. DHS and its Components handle misdirected requests during daily triage and route the requests within one business day of receipt, if possible via e-mail." *Id.*

Taken together, these documents paint a picture of an agency which conscientiously interpreted a Congressional amendment of FOIA to impose a duty to minimize agency gamesmanship about "proper offices" by referring a request in any instance in which a component receiving a request determines that the records are maintained by another component. 2012 Memo at 1. More importantly, the agency decided to emphasize the fact that if the responsive records are held by another agency component, it would do so "without the need for further action from the requester." 80 Fed. Reg. at 45102. After first implementing this policy through a memorandum, the agency then went on to tout its policy in annual

37

reports, solidifying the definition of "misdirected request" as "a request sent to the wrong office *by a requester*, sometimes many times. *See* 2014 Chief FOIA Officer Rep. at 45. For at least *five years* leading up to the finalizing of 6 C.F.R. § 5.4(c), the agency interpreted its duty in the same way that Appellants do now, which is the same way that the sponsor of the amendment changing "the agency" to "the appropriate component of the agency" interpreted it: "I think that it is reasonable to expect that once a FOIA component of the agency gets the request, it will expeditiously route that request to the appropriate FOIA component." 153 Cong. Rec. S10988 (Aug. 3, 2007) (statement of Sen. Kyl). It is no coincidence that there is no evidence that DHS's interpretation changed until the regulation became part of a lawsuit: only then did the previous, laudable interpretation focused on the public interest take a backseat to the desire to win this case with the bare minimum effort at all costs which has characterized DHS's litigation posture ever since Appellants' complaint was filed. "By making this argument, perhaps swept up in litigation fervor, the [agency] is bending the record in this case in a highly misleading way," *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 139 (D.D.C. 2013), and the Court should reverse the District Court's holding endorsing this interpretation, if not consider sanctions for such bad faith litigation conduct.

Accordingly, the District Court's holding that DHS was not required to refer the FOIA requests at issue in Counts 1 and 2 to CBP was clearly wrong as a matter

of law and should be reversed. Once the District Court orders DHS to refer these requests to CBP and CBP processes them, Appellees will then need to seek summary judgment on CBP's processing of the referred requests.

## V.    PROPRIETY OF CLAIMED EXEMPTIONS

The Recommendation only discussed Exemptions (b)(3) and (b)(5), stating first that, "At the Hearing, Plaintiffs stated that, if the undersigned found against them on the threshold issues of Requested Correspondence and the presumption of good faith, which the undersigned has, they would withdraw their objections to Defendants' invocation of Exemptions 6, 7(C), and 7(E). Therefore, the undersigned need only address objections to Exemptions 3 and 5." DE 86 at 13. The necessity of discussing the other exemptions turns on whether this Court reverses the District Court regarding the threshold issues, but as the Recommendation only touches on Exemptions (b)(3) and (b)(5), that is what Appellants focus on here.

### A.    THE RECOMMENDATION IMPROPERLY CONSTRUED THE INA § 222(f) EXEMPTION

FOIA requests are to be construed broadly and exemptions are to be construed narrowly. Exemption (b)(3) is no exception to this principle. Indeed, it says so itself that it covers "matters that are . . . *specifically* exempted from disclosure by statute." 5 U.S.C. § 552(b)(3) (emphasis added). The non-disclosure statute must "*require*[] that the matters be withheld from the public in such a

39

manner as to leave *no discretion on the issue*," or must "establish[] *particular* criteria for withholding or refer[] to the *particular* types of matters to be withheld." *Id.* (emphasis added).

Yet the Recommendation accepted Appellees' argument on a relatively novel question of law despite the statutory provision at hand, § 222(f) of the Immigration and Nationality Act—codified at 8 U.S.C. § 1202(f) ("INA § 222(f)")—*not* specifically exempting the relevant documents from disclosure, *not* "requiring" that the matters be withheld in such a manner as to leave no discretion on the issue, and *not* "establishing particular criteria for withholding or referring to the particular types of matters to be withheld." Appellees cited, and the Recommendation adopted, a line of cases outside this Circuit which, in clear contradiction to FOIA's guiding presumption of disclosure, *assume* that documents regarding a visa revocation count as records "pertaining to the issuance or refusal of visas" for Exemption (b)(3) purposes. This is despite the statutory requirement that a statute exhibit: (1) specificity; (2) a removal of discretion from the agency; and (3) the clear delineation of what kinds of matters are to be withheld.

The question before the Court on this issue is straightforward: does the Court follow the lead of the D.C. Circuit and Second Circuit and hold that INA § 222(f) applies to visa cancellations and revocations, or does it follow the lead of other district courts in this district, the District of Connecticut, and the Western

District of Washington and hold that INA § 222(f) does *not* apply to visa cancellations and revocations? Appellants freely acknowledge that if the Court follows the case law of the D.C. Circuit and Second Circuit, they lose this argument, but they maintain that the other district courts have the better argument.

Simply put, this case rises and falls on two fundamental principles: 1) FOIA exemptions are to be narrowly construed; and 2) *expressio unius est exclusio alterius*—the expression of one thing implies the exclusion of others. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, 107 (2012) [hereinafter *Reading Law*].

This Circuit summarizes the first point thusly:

> "[D]isclosure, not secrecy, is the dominant objective of the Act." Because the net effect of the FOIA, with its exemptions, is to "'place[] emphasis on the fullest responsible disclosure,'" the Supreme Court has "repeatedly stated that the policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly."

*News-Press v. DHS*, 489 F.3d 1173, 1191 (11th Cir. 2007) (citations omitted) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361, 366 (1976), and *EPA v. Mink*, 410 U.S. 73, 80 (1973)). In other words, if one reasonable reading of a statute would lead to disclosure, and another reasonable reading of a statute would lead to withholding, the Court must adopt the first reading. This rule led another court in this district to conclude, "Consistent with *Halpern* [*v. FBI*, 181 F.3d 279 (2d Cir. 1999)], the undersigned construes Section 1202(f) of the INA narrowly

41

and finds that it does not encompass the revocation of visas." *Mantilla v. Dep't of State*, No. 12-21109, 2012 U.S. Dist. LEXIS 136152, at *11 (S.D. Fla. Sept. 24, 2012), *recons. denied* 2013 U.S. Dist. LEXIS 13917 (S.D. Fla. Feb. 1, 2013). *See also Guerra v. United States*, No. 09-1027, 2010 U.S. Dist. LEXIS 132999, at *5 (W.D. Wa. Dec. 15, 2010) (holding that the D.C. Circuit's opinion in *Medina-Hincapie v. Dep't of State*, 700 F.2d 737 (D.C. Cir. 1983), was incompatible with "FOIA's goal of broad disclosure").

The question then becomes, is Appellants' reading of the statute, bolstered by these other district court opinions, reasonable? To answer this, the District of Connecticut looked to the statutory interpretation maxim *expressio unius est exclusio alterius*:

> Relying solely on the plain language of the statute and the interpretive doctrine of *expressio unius*, the statute cannot be read to apply to visa revocations. That is, while both "issuance" and "refusal" of visas are explicitly mentioned, "revocation" is not. *See* 8 U.S.C. § 1202(f). Clearly, the issuance of, or the refusal to issue, a visa is not a revocation. Thus, on the plain language of the statute, records pertaining to visa revocation are not protected under the INA, and CBP improperly withheld information under Exemption 3.

> Even if the court were to look past the plain language of the statute, however, the legislative history of the INA generally confirms this reading. When the 104th Congress passed the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), a bill amending the INA (including § 222), it continued to treat visa revocations separately from issuances and refusals. *See* Pub. L. 108-458, 118 Stat. 3638. For example, § 5304 of that Act, entitled "Revocation of Visas and Other Travel Documentation," can be contrasted with § 5302, "Visa Application Requirements." *Id.* The fact that the two procedures are

42

addressed in distinct sections of the legislation evidences an intent on
the part of the lawmakers that visa revocation be treated as distinct from
visa application (i.e., issuance or refusal of visas). Beyond mere titles,
however, the legislation made discrete distinctions substantively. *See*
Pub. L. 108-458 § 5304, 118 Stat. 3638, 3736 (changing judicial review
for visa revocation, but not for issuance or denial). This clear legislative
intent, when read with the plain language of the statute, leads to the
conclusion that 8 U.S.C. § 1202(f) does not apply to visa revocation.

*El Badrawi v. DHS*, 583 F. Supp. 2d 285, 311-12 (D. Conn. 2008) (footnotes

omitted). While the Second Circuit invalidated this opinion last year, *Spadaro v.

CBP*, 978 F.3d 34, 46-47 (2d Cir. 2020), that is of little moment in this case.

Reversal by the Second Circuit only means that *El Badrawi* is not controlling

precedent *in the Second Circuit*; this Court is still free to adopt its reasoning as its

own.

Appellees' argument relies almost entirely on an inadmissible legal opinion

expressed by a fact witness: "The revocation adjudication pertains directly to the

issuance and refusal of a visa because a revocation is a decision that the current

visa should not have been issued or that a future visa may need to be refused." DE

29-3 at 15-16. However, it is well-accepted that legal conclusions, unlike factual

assessments, have no place in witnesses' declarations, as they "intrude upon the

duties of, and effectively substitute for the judgment of, the trier of fact and the

responsibility of the Court to instruct the trier of fact on the law." *United States ex

rel. Mossey v. Pal-Tech, Inc.,* 231 F. Supp. 2d 94, 98 (D.D.C. 2002). *See also

Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir.

1990) (district court abused its discretion by allowing expert witness to testify about legal conclusions). The Court should accordingly pay little heed to Stein's opinion about whether the statute encompasses visa revocations, and in fact should look askance on his entire declaration, as full as it is of legal arguments and frequent citations to case law.

The legal reasoning behind this position boils down to the position taken by the Second Circuit in *Spadaro*, which hinges on the meaning of the phrase "pertaining to": "Thus, we conclude that the use of the broad phrase 'pertaining to' plainly gives the statute a wider reach than mere issuances and refusals." 978 F.3d at 46. However, by focusing on the philosophical breadth of this phrase, the Second Circuit failed to recognize the dangers of overreliance on a phrase like this: "A request for all documents 'relating to' a subject is usually subject to criticism as overbroad since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote fashion." *Massachusetts v. Dep't of Health & Human Servs.*, 727 F. Supp. 35, 36 n.2 (D. Mass. 1989) (paraphrasing Oliver W. Holmes, Jr., *The Common Law* 1 (1945)). According to this reading, every document in the State Department would be exempt under INA § 222(f) because they all relate *in some way* to visa issuances and denials. While such an extreme position is not practical, the position actually being taken in this case is not far removed. Not only are records about visa revocations related to visa issuances because every visa that

44

is revoked has to have been issued, but *even the number of records about revocations* is also related to visa issuances. If the Court were to validate this position, it would effectively be giving a blank check to State to refuse to even process records even tangentially related to some visa somewhere, in clear violation of the rule that exemptions must be narrowly construed.

Furthermore, while Appellees and the District Court rely heavily on *Spadaro*, it is important to emphasize that *Spadaro* is *not a Florida case.* In *Advisory Op. to the Governor Re: Implementation of Amendment 4, the Voting Restoration Amendment*, 288 So. 3d 1070, 1078 (Fla. 2020) (hereafter "*Advisory Op. Re: Amendment 4*"), the Florida Supreme Court affirmed its adherence to the "supremacy-of-text" principle: that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Reading Law* at 56. The court further cited Justice Joseph Story's approach to the interpretation of constitutional texts—which the court noted is "equally applicable to other texts"—that "every word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." 288 So. 3d at 1078 (quoting Joseph Story, *Commentaries on the Constitution of the United States* 157-58 (1833) (quoted in *Reading Law* at 69)).

As may be expected, the Florida Supreme Court has indeed since applied this textualist approach to its other cases calling for statutory or constitutional interpretation. *See*, *e.g.*, *Fla. Dep't of Health v. Florigrown, LLC*, No. 19-1464, 2021 Fla. LEXIS 843, at *17 (Fla. May 27, 2021) ("All of these claims present issues of statutory or constitutional construction . . . and, to the extent that these texts are clear and unambiguous, we accord them their plain meaning without resort to external sources cited in support of a litigant's view of what the legislators or voters intended beyond that plain meaning."); *Page v. Deutsche Bank Tr. Co. Ams.*, 308 So. 3d 953, 958 (Fla. 2020); *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 947 (Fla. 2020); *Barnett v. State*, 303 So. 3d 508, 516 (Fla. 2020).

This is not a new principle for the Florida Supreme Court; such a textualist approach by the court goes back at least several decades. *See*, *e.g.*, *Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n*, 489 So. 2d 1118, 1119 (Fla. 1986) (citing *Plante v. Fla. Commission on Ethics*, 354 So. 2d 87, 89 (Fla. 1st Dist. Ct. App. 1977)); *accord Pleus v. Crist*, 14 So. 3d 941, 944 (Fla. 2009) ("If that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written.") (quoting *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503, 511 (Fla. 2008)).

Federal district courts in this Circuit have also taken notice of the Florida Supreme Court's textualist approach that was reaffirmed in *Advisory Op. Re:*

46

*Amendment 4*. In *Woronec v. Zachry Indus.*, No. 18-2244, 2021 U.S. Dist. LEXIS 27772, at *16-17 (M.D. Fla. Feb. 12, 2021), for example, the Middle District of Florida quotes *Page v. Deutsche Bank*, 308 So. 3d 953—and that case's citation of *Advisory Op. Re: Amendment 4*—in stating that a stricter textualist approach is more consistent with how the Florida Supreme Court would approach the case "if the issue were presented to it." In *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1208 (N.D. Fla. 2020), the Northern District of Florida also acknowledged the Florida Supreme Court's approach and its textualism-based decision in *Advisory Op. Re: Amendment 4*.

While the Florida Supreme Court's long held (and now, further reinforced) approach to statutory interpretation is of course not itself binding on federal courts, this Circuit has previously cited the same passages of *Reading Law* that the Florida Supreme Court cited in *Advisory Op. Re: Amendment 4*. *See*, *e.g.*, *United States v. Frediani*, 790 F.3d 1196, 1200-01 (11th Cir. 2015) (quoting *Reading Law* at 56: "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); *Andrews v. Warden*, 958 F.3d 1072, 1078 (11th Cir. 2020) (same); *Thai Meditation Ass'n of Ala., Inc., v. City of Mobile*, 980 F.3d 821, 838-39 (11th Cir. 2020) (citing *Reading Law* at 56 and 69, just as *Advisory Op. Re: Amendment 4* did); *United States v. Tigua*, 963 F.3d 1138, 1142-43 (11th Cir. 2020) (same).

This Circuit has also heeded the U.S. Supreme Court's holdings that the "starting point" of statutory interpretation is "the language of the statute itself," *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986), and that the "cardinal canon" of statutory interpretation is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *United States v. Aldrich*, 566 F.3d 976, 978-79 (11th Cir. 2009).

Statutory interpretation methodology exists somewhere between "law" and individual judicial philosophy, and the question of how much persuasive or binding effect even the same court's interpretive approach has on its own future decisions "remains entirely unresolved"—let alone the question of whether state and federal courts must or should follow one another's interpretive approaches. Abbe R. Gluck, *Intersystemic Statutory Interpretation: Methodology as "Law" and the* Erie *Doctrine*, 120 Yale L.J. 1898, 1902 (2011). As a result, although federal courts should generally defer to state court interpretations of state law, *see, e.g.*, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 72-73 (1938), and although other states have reached varying conclusions regarding the precedential effect of state court interpretive approaches, *see generally* Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation*, 119 Yale L.J. 1750 (2010), it is far from a given that the Florida Supreme Court's expressed preference for such a strong

48

textualist approach binds this Court. However, given the potentially quasi-precedential status that may arguably be afforded to a state court's stated interpretive approach, the Florida Supreme Court's clear preference for textualism should be considered at least persuasive if not instructive for this Court's approach to interpreting a federal law, especially when viewed in combination with the federal case law citing similar if not identical principles.

Therefore, such a text-based approach is not necessarily binding on the Southern District of Florida, but it is appropriate in this case because such an approach is both consistent with the Florida Supreme Court's approach and with prior approaches to statutory interpretation in Eleventh Circuit and Supreme Court case law. As a result, when given a choice between reading *into* a statute and *reading* a statute, this Court should follow the lead of the courts cited by Appellants and hold that Congress said what it meant and meant what it said, and no more.

Accordingly, since reasonable arguments exist on both sides of this issue, but only Appellants' argument respects both the "dominant objective of [FOIA]," *Rose*, 425 U.S. at 361, and a common-sense reading of a common phrase, the Court should continue to hold that INA § 222(f) does not apply to visa revocations and reverse the District Court's grant of summary judgment to Appellees on all Exemption (b)(3) withholdings.

49

Even if this Court decides against Appellants on this legal question, however, the Recommendation took Appellees at their word that all the records for which Exemption (b)(3) is asserted—for Counts 1, 2, 4, 7, 8, and 10—are actually, fully about visa revocations and not something merely *touching* on visa revocations, which would remove them even further from the proper scope of Exemption (b)(3) and the INA. For this reason—especially because of Appellees' credibility issues discussed previously—if the Court decides against Appellants regarding § 222(f), it should strongly consider either performing *in camera* review of these records, ordering a segregability analysis, or both, rather than affirming the District Court's grant of summary judgment for Appellees on all these counts.

## B. THE RECOMMENDATION FAILED TO ACKNOWLEDGE SIGNIFICANT PROBLEMS WITH THE SECOND STEIN DECLARATION

The Recommendation afforded no weight to the significant course reversal that State pursued between the First and Second Stein Declarations. It merely recited the standard for deliberative process privilege, noted that the Second Stein Declaration recites this standard, dismissed Plaintiffs' objections, and found that State properly relied on Exemption (b)(5) for the withholdings under Count 8. This finding comes despite numerous problems, all of which are completely ignored.

First, Stein asserted attorney work product doctrine in the first declaration, DE 29-3 at 20, but changed to deliberative process privilege in the second, calling

50

the first assertion "inadvertent." DE 74-1 at 7. But these are entirely different legal doctrines with entirely different standards—and tellingly, in each declaration, he recites the legal standard and claims the withheld documents fall under them, but he specifies no more and no less. In the first declaration, for attorney work product doctrine, the *withheld information* apparently "reflects confidential communications and advice between Department officials and Department attorneys regarding visa applications." DE 29-3 at 20. In the second, he asserts that this was a mistake, and really, under the deliberative process privilege, *the same withheld information* "reflects internal Department communications that are pre-decisional . . . and deliberative." DE 74-1 at 7. Disclosure of it "would impede the ability of responsible Executive Branch officials to formulate recommendations regarding, and effectively execute, visa adjudications by inhibiting candid discussion and the expression of viewpoints and judgments regarding said adjudications." DE 74-1 at 7. But these are *not the same thing*. If the *explanation* had been the same but the first declaration had merely swapped the *words* "attorney work product doctrine" for "deliberative process privilege," that might be more understandable. But Stein declared under oath, first, that the withheld information was "confidential" and implied that it was *only* "between Department officials and Department attorneys," and second, that any records not covered by

attorney-client privilege are pre-decisional and deliberative and that disclosure would hurt that process.

Not only did the Recommendation not question this about-face whatsoever, it also accepted without a second thought that Stein provided enough specificity to sufficiently demonstrate Exemption (b)(5)'s applicability. But *both times*, the declarations did not elaborate whatsoever. Stein quite literally only recited the appropriate standards, asserted that information was properly withheld pursuant to them, and immediately moved on to Exemption (b)(6). Despite the Recommendation's accurate citation of case law stating that "mere conclusory" statements will not suffice, Stein's statements are about as conclusory as they could get, but the Recommendation nonetheless found that he provided enough specifics. DE 86 at 17.

Furthermore, the Recommendation briefly asserted regarding the Stein Declarations that "the information is not contradicted in the record" and "there is no evidence in the record of agency bad faith." DE 86 at 17. This assertion comes directly after glossing over Stein's direct contradiction *of himself*—at least "inadvertently," as he asserted, but contradicting himself nevertheless. As for evidence of bad faith, Appellants contend this is at least plausibly evidence of bad faith by State. Either way, the Recommendation did not consider these points at all, but rather merely recited these quotes and moved to the conclusion.

## VI.   THE FORESEEABLE HARM STANDARD MUST BE ADDRESSED

Lastly, the Recommendation was completely silent on the foreseeable harm standard which was added to FOIA in 2016. 5 U.S.C. § 552(a)(8)(A)(i); *see also Scott v. IRS*, No. 18-81750, 2021 U.S. Dist. LEXIS 14061, at \*60-63 (S.D. Fla. Jan. 26, 2021). Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." H.R. Rep. No. 391, 114th Cong., 2d Sess. 9 (2016). Agencies cannot rely on "mere 'speculative or abstract fears,' or fear of embarrassment" to withhold information. S. Rep. No. 4, 114th Cong., 1st Sess. 8 (2015). Nor may the Government meet its burden with "generalized assertions." *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020). In that way, the foreseeable harm requirement "impose[s] an independent and meaningful burden on agencies." *Center for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (citation omitted). While agencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—"that is, group together like records" and explain the harm that would result from release of each group—the basis and likelihood of that harm must be independently demonstrated for each category. *Rosenberg v. DOD*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).

53

In the context of withholdings made under Exemption (b)(5) and the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure "would"—not "could"—adversely impair internal deliberations. *Machado Amadis*, 971 F.3d at 371. "[G]eneral explanations and boiler plate language" regarding foreseeable harm are insufficient. *Center for Investigative Reporting*, 436 F. Supp. 3d at 106. Instead, in the context of the deliberative process privilege, "what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021).

Despite the fact that this has been a legal requirement for Exemption (b)(5) claims for over six years, there is absolutely no discussion of the foreseeable harm requirement in the Recommendation. This by itself warrants reversal, since the Supreme Court has unequivocally stated that "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). Allowing a District Court to grant summary judgment to an agency without addressing a factor Congress specifically added to the governing statute by formal amendment would be the opposite of "real and substantial effect." Accordingly, the District Court's holding that State

54

properly invoked Exemption (b)(5) to withhold information from the request at issue in Counts 8 was clearly wrong as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should reverse and vacate the District Court's order.

Date: September 9, 2023

Respectfully submitted,


 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing filing contains 12,892 words, and was prepared in 14-point Times New Roman font using Microsoft Word 2016.

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of September, 2023, I filed the foregoing with the Court's Electronic Case Filing system, causing a copy to be served via electronic mail on Appellees' counsel of record.

Date: September 9, 2023

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Appellants*