[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10073

_____

IVAN JIMENEZ,
JUAN MACHADO,
JOSE MUNOZ,
MIGUEL VASQUEZ,

                                        Plaintiffs-Appellants,

GUILLERMO SENCION,

                                        Plaintiff,

*versus*

DEPARTMENT OF HOMELAND SECURITY,
DEPARTMENT OF STATE,

                                        Defendants-Appellees.

2                          Opinion of the Court                    23-10073

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-21546-DPG

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and HULL, Circuit
Judges.

HULL, Circuit Judge:

This appeal arises out of records requests the plaintiffs made
to three federal agencies under the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552. The plaintiffs, citizens of the Dominican
Republic, sought, *inter alia*, information pertaining to the
revocation of their U.S. visas. The federal agencies produced some
responsive records but redacted some information within those
records and withheld other records in full under certain FOIA
exemptions, including Exemption 3 and the Immigration and
Nationality Act § 222(f).

The plaintiffs filed this action challenging the adequacy of
some of the searches and the propriety of the agencies' claimed
exemptions. Ultimately, the parties filed cross-motions for
summary judgment. The government filed declarations from the
agencies' respective FOIA officials about the plaintiffs' requests and
about the records withheld in full or in part.

The district court granted the government's summary
judgment motion and denied the plaintiffs' cross-motion. The

district court concluded, *inter alia*, that the agencies showed they performed adequate searches and properly invoked FOIA Exemption 3 in withholding and redacting documents.

After careful review of the record and briefs, and with the benefit of oral argument, we affirm the district court's entry of summary judgment in favor of the government.

## I. BACKGROUND

### A.    Plaintiffs' FOIA Requests and Agencies' Responses

Plaintiffs Juan Machado, José Muñoz, and Miguel Vásquez are all citizens and residents of the Dominican Republic who at some point had their U.S. visas revoked. Between 2013 and 2018, Machado, Muñoz, and Vásquez made multiple FOIA requests directed to federal agencies involved in their visa revocations, including (1) the Office of Biometric Identity Management ("OBIM"); (2) United States Citizenship and Immigration Services ("USCIS"); and (3) the State Department. OBIM and USCIS are two components of the Department of Homeland Security ("DHS"). Plaintiff Iván Jiménez, a legal resident of Florida, was a co-requester with the other plaintiffs.

The plaintiffs' requests variously sought: (1) from OBIM, information about Machado and Muñoz located in two specific storage systems—the Automated Biometric Identification System ("IDENT") and the Arrival and Departure Information System ("ADIS")—and any other OBIM systems; (2) from USCIS, Machado's and Muñoz's alien files; and (3) from the State Department, information in general about Machado, Muñoz, and

Vásquez and in particular information pertaining to the revocation of their U.S. visas, including suspected criminal activity.

In some instances, the plaintiffs submitted more than one request to the same agency for the same information, but those requests were years apart. Sometimes an agency released records more than once in response to a request. Sometimes an agency located no responsive records or released redacted records. Also, during this litigation, USCIS found in its files 26 pages of documents that USCIS referred to the FOIA office of the U.S. Immigration and Customs Enforcement ("ICE"), another DHS component. ICE then released those 26 pages several times with redactions.

Given that the plaintiffs' requests and the agencies' responses to them varied, we will discuss them in more detail as needed to address the different issues on appeal. For present purposes, it is enough to say that the agencies located and produced some responsive records, but they also withheld some records in whole or in part based on certain FOIA exemptions.

## B.    District Court Proceedings

In April 2019, unsatisfied with the agencies' responses, the plaintiffs filed this action against DHS and the State Department (collectively the "government") pursuant to FOIA, 5 U.S.C. § 552, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651. The complaint alleged that the defendants— OBIM (Counts 1 and 2), USCIS (Counts 4 and 5), and the State

Department (Counts 7, 8, and 10)—had denied the plaintiffs' records requests in violation of their FOIA rights.[1]

The district court granted the government an extension of time to respond to the complaint while the agencies completed their final production of documents in response to the plaintiffs' FOIA requests (collectively the "final responses"). The district court administratively closed the case. After the production process finished, the parties filed cross-motions for summary judgment. By the summary judgment stage, the dispute between the parties was primarily centered on the agencies' final responses to the plaintiffs during the litigation.

The government's summary judgment motion argued the agencies had performed adequate searches, produced responsive documents, and properly withheld or redacted some documents pursuant to certain FOIA exemptions. In support, the government submitted four declarations from these FOIA officers responsible for FOIA responses by their respective agencies: James Holzer (OBIM), Jill Eggleston (USCIS), Fernando Pineiro (ICE), and Eric Stein (the State Department).

In response, the plaintiffs challenged on various grounds the adequacy of the Holzer, Eggleston, and Pineiro declarations to carry the government's FOIA burden at summary judgment, the

---

[1] Record requests made by Jiménez and a fifth plaintiff, Guillermo Sención, formed the basis of Counts 3, 6, and 9. On appeal, the plaintiffs do not challenge the district court's entry of summary judgment on Counts 3, 6, and 9, and we do not address them further.

adequacy of OBIM's searches for records about Machado and Muñoz, and the government's invocation of certain FOIA exemptions.[2]

After a hearing, a magistrate judge entered a report recommending the government's motion for summary judgment be granted on all counts of the plaintiffs' complaint and the plaintiffs' cross-motion be denied. Over the plaintiffs' written objections, the district court adopted the report. The district court granted the government's motion, denied the plaintiffs' cross-motion, and entered summary judgment for the government on all counts.

This appeal followed.

## II. STANDARDS OF REVIEW

"[U]sually, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified and after the government has supplied affidavits or other information describing the documents." *Sikes v. U.S. Dep't of Navy*, 896 F.3d 1227, 1239 (11th Cir. 2018) (quotation marks omitted). We "review[] a district court's grant of summary judgment in a FOIA case *de novo*, viewing all facts and reasonable inferences in the light most favorable to the non-moving party, and applying the

---

[2] In withholding some information, some agencies invoked FOIA exemptions 6, 7(C), and 7(E). At summary judgment the plaintiffs withdrew their challenges to those exemptions, so the district court did not address them. In this appeal, the plaintiffs do not raise any issue as to Exemptions 6, 7(C), and 7(E).

same standard used by the district court." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008).[3]

This Court reviews for an abuse of discretion a district court's evidentiary rulings at the summary judgment stage. *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1359 (11th Cir. 2014).

## III.  GENERAL FOIA PRINCIPLES

Under FOIA, requesters can seek the release of records maintained by a federal agency.  5 U.S.C. § 552(a).  FOIA requires the federal agency, upon a records request that reasonably describes documents held by that agency, to make those documents promptly available to any person unless a statute exempts the information from disclosure. *Id.* § 552(a)(3), (b)(3). FOIA reflects a "strong public policy in favor of public access to information in the possession of federal agencies." *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1190 (11th Cir. 2007) (quotation marks omitted).

---

[3] Our Court has said that where "there [is] a *factual* dispute between the parties as to the very *nature* of the withheld documents, and thus as to whether they even fell within the applicable exemption," our review is "for clear error." *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1187-88 (11th Cir. 2007).  Because the withheld or redacted documents relate to visa revocations and the parties do not dispute the nature of those withheld or redacted documents pursuant to FOIA Exemption 3, we need not apply this standard of review.

A plaintiff may sue in federal court upon a showing that a federal agency has improperly withheld its records following a FOIA request.  5 U.S.C. § 552(a)(4)(B).  The agency bears the burden to demonstrate that its records search was adequate and it properly withheld information.  *Id.*; *Miccosukee Tribe*, 516 F.3d at 1248, 1258; *Broward Bulldog, Inc. v. U.S. Dep't of Just.*, 939 F.3d 1164, 1175 (11th Cir. 2019).

An agency may rely on affidavits or declarations (collectively "declarations") to meet its burden "so long as they provide an adequate factual basis for the district court to render a decision." *Miccosukee Tribe*, 516 F.3d at 1258-59 (stating an adequate factual basis can be provided by affidavits, a *Vaughn* index, *in camera* review, or a combination of these methods).[4]  The declarations "of responsible officials" must be "relatively detailed, nonconclusory, and submitted in good faith."  *Broward Bulldog*, 939 F.3d at 1176 (quotation marks omitted).

An agency's declarations are entitled to a presumption of good faith.  *See Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994); *Carney*

---

[4] A *Vaughn* index, prepared pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), is "a list containing the information claimed as exempt and the corresponding exemption under which it is claimed."  *Miccosukee Tribe*, 516 F.3d at 1258.  A *Vaughn* index is not always required.  *Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993) (holding "in certain cases, affidavits can be sufficient for summary judgment purposes . . . if they provide as accurate a basis for decision" as other methods).  Two agencies here provided both a *Vaughn* index and a declaration, but two provided only a declaration.  In this appeal, the plaintiffs do not make any arguments about the lack of a *Vaughn* index.

*v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994); *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). That presumption can be rebutted with evidence of bad faith on the part of the agency. *Jones*, 41 F.3d at 242; *Carney*, 19 F.3d at 812; *Maynard*, 986 F.2d at 556; *SafeCard Servs.*, 926 F.2d at 1202. Mere speculation, however, is not enough to rebut the presumption. *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 74 (D.C. Cir. 2018); *SafeCard Servs.*, 926 F.2d at 1200.

## IV.  ADEQUACY OF DECLARATIONS

### A.    Rule 1002 and FOIA Correspondence

The plaintiffs argue that the declarations from Holzer (OBIM) and Eggleston (USCIS) violated the best evidence rule in Federal Rule of Evidence 1002 and are thus inadmissible. The plaintiffs contend the agencies must attach to the declarations all original FOIA correspondence between the agency and the requesters (or at least file it on the record), and the agencies violated Rule 1002 by failing to do so.[5]

Under Rule 1002, "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Rule 1002 essentially restates "the so-called 'best evidence' rule." *Allstate Ins. Co. v.*

---

[5] Holzer's declaration was filed in support of the government's motion for summary judgment as to Counts 1 and 2. Eggleston's declaration was filed in support of summary judgment as to Counts 4 and 5.

*Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994) (quotation marks omitted).

The purpose of Rule 1002 is "to prevent inaccuracy and fraud when attempting to prove the contents of a writing." *United States v. Ross*, 33 F.3d 1507, 1513 (11th Cir. 1994). To that end, "Rule 1002 requires production of an original document *only* when the proponent of the evidence seeks to prove the content of the writing." *Allstate Ins.*, 27 F.3d at 1543 (emphasis added). Rule 1002 "does not . . . require production of a document simply because the document contains facts that are also testified to by a witness." *Id.* (quotation marks omitted).

Further, at summary judgment, we may consider facts in a declaration so long as those facts later can be reduced to an admissible form. *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). A party also may cite to a stipulation to establish that a fact is not disputed. Fed. R. Civ. P. 56(c)(1)(A).

## B.     Correspondence Between Agencies and Plaintiffs

As we explain below, the Holzer (OBIM) and Eggleston (USCIS) declarations did not violate Rule 1002. There are two types of correspondence at issue here: (1) the plaintiffs' requests to the agencies; and (2) the subsequent administrative correspondence between the agencies and the plaintiffs about their requests. We address each in turn.

As to the first type, in support of summary judgment, the government filed a statement of material facts that listed each request, including the date of the request, the agency to which the

request was directed, and the information sought in the request. The plaintiffs admitted each of these statements about the requests. Thus, the plaintiffs' Rule 1002 argument fails because any statements about the contents of the requests were admissible in another form—as a stipulation. *See* Fed. R. Civ. P. 56(c)(1); *Rowell*, 433 F.3d at 800. Stated another way, because those facts were undisputed at summary judgment, the government did not need to prove them by submitting a copy of the plaintiffs' requests.[6]

The thrust of the plaintiffs' argument involves the second type of correspondence—the subsequent correspondence between the agency and the plaintiffs about their requests. However, the plaintiffs do not point to any specific statements in the declarations about such correspondence. A party must make specific objections to evidence. *See* Fed. R. Evid. 103(a)(1)(B). Neither this Court nor the district court are required to guess which statements in a declaration a party might be challenging. A party who objects to a declaration on Rule 1002 grounds must identify the specific statements the party claims impermissibly seek to prove the content of a writing. The plaintiffs did not do so.

The real crux of the plaintiffs' challenge is that the declarations "cherry-pick" and "pointedly omit" the subsequent

---

[6] The only statement the plaintiffs identify in their appeal brief is a statement in Holzer's declaration that Machado submitted his record request to OBIM on November 14, 2018 and sought information pertaining to himself in the IDENT and ADIS systems. Yet that was stipulated, as explained above, in response to the government's statement of material facts.

FOIA correspondence about their requests. If the government is not relying on the contents of a particular piece of subsequent correspondence to carry its FOIA burden, then Rule 1002 does not apply to that correspondence in the first place.

Contrary to the plaintiffs' contention, Rule 1002 does not require an agency in FOIA litigation to provide the district court with *all* subsequent correspondence related to the FOIA request *as a matter of course*. The declarations were not offered to prove the contents of subsequent correspondence between the agencies and the plaintiffs. Rather, the declarations were submitted to show that the agencies conducted adequate searches and that certain exemptions applied to withheld records or to redactions in produced records. The subsequent correspondence was not needed, much less required, for the government to do that and carry its burden to show adequate searches and properly invoked exemptions.[7]

## C.    Good Faith Presumption

The plaintiffs next contend they rebutted the presumption of good faith as to the declarations of Holzer (OBIM) and Pineiro (ICE) by presenting evidence that their agencies sometimes withheld information they previously had released.

---

[7] It is not clear that Rule 1002 even applies to declarations in FOIA litigation at summary judgment. Because the plaintiffs' Rule 1002 claims so clearly fail, we need not address that issue.

For Holzer's declaration, the plaintiffs point to discrepancies between what was redacted in succeeding productions: more before litigation and less after litigation. Specifically, the plaintiffs identified eight pages from a United States Visitor and Immigrant Status Indicator Technology (US-VISIT) Secondary Inspection Tool Report about Muñoz, dated February 13, 2019. OBIM redacted portions of these eight pages pursuant to Exemption 3 because the information pertained to the issuance or refusal of a visa. The plaintiffs submitted an earlier disclosure of a similar 10-page US-VISIT Secondary Inspection Tool Report about Muñoz, dated July 17, 2013, and argue the stark "difference between these two releases" shows OBIM's bad faith. The plaintiffs suggest the reason for the difference in redactions is that when OBIM processed the second release in 2019, DHS anticipated litigation and "chose to take a hardline approach."

For Pineiro's declaration, the plaintiffs point to a series of releases by ICE of the same 26 pages from Machado's alien file. According to Pineiro's declaration, ICE released these 26 pages on February 18, 2020 and again on December 30, 2020. Then, after a "litigation review," ICE determined that the two prior productions "were not redacted the same" and sent the plaintiffs a third production on March 23, 2021.[8]

Pineiro explained that "ICE has a number of FOIA analysts" and that, despite training and supervision, there "can be differences

---

[8] Pineiro's declaration was filed in support of the government's motion for summary judgment as to Count 4.

in processing" the same set of documents by different analysts who come to different conclusions about the application of exemptions. "[I]n order to make consistent the withholdings asserted on the two previous productions," Pineiro stated that "ICE FOIA went through both previous productions and released a third version, which contained the fewest withholdings and released the most information possible." Pineiro represented that the March 23, 2021 "third production removed any inconsistencies between the first two productions," in February and December 2020, as reflected in the *Vaughn* index attached to his declaration.

The plaintiffs submitted copies of the three productions Pineiro described and another production of the pages on June 9, 2020 that Pineiro did not mention. The plaintiffs admit that each of the four productions was signed by a different FOIA officer and that "ICE withheld the same information" in the second-in-time production (June 9, 2020) and third-in-time production (December 30, 2020). The plaintiffs nonetheless contend they have shown bad faith because a mere difference of opinion between FOIA officers cannot account for the "massive discrepancy" between the *first*-in-time and the *second*-in-time productions. They emphasize that only the first FOIA officer, who redacted less information than the second or third FOIA officer, was "unaware of the litigation," and suggest Pineiro deliberately omitted the second-in-time production (June 9, 2020) from his declaration because it "did not fit the narrative."

After careful review of the documents, we conclude the plaintiffs failed to overcome the good faith presumption for the Holzer (OBIM) and Pineiro (ICE) declarations.  At the outset, we agree with the district court that evidence an agency inconsistently redacted the same document, by itself, does not show bad faith. *See, e.g.*, *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 79-80 (D.D.C. 2020) (concluding that evidence an agency withheld more information within the same slide deck in subsequent productions was not evidence of "bad faith" because the court accepted the agency's explanation of human error, and the agency subsequently corrected any errors).  This is especially true when the redactions were made years apart or by different FOIA officials or where the agency explains the inconsistency and subsequently corrects any errors.  *See id.*

Similarly, the presumption of good faith is not rebutted by the existence of earlier contradictory classifications of withheld documents.  *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 80-81 (D.C. Cir. 1987) (indicating evidence of *earlier* non-classified designation in ambassadors' questionnaires did not undermine or call into question the correctness of the later classification status of the withheld information and thus did not controvert the agency's affidavit for summary judgment purposes).

As the record here demonstrates, agencies often have multiple FOIA analysts processing FOIA requests.  While efforts are made to train and supervise to ensure consistencies in processing FOIA requests, those analysts will not always agree on

whether requested information falls within a FOIA exemption. And sometimes an earlier or later FOIA analyst may make a mistake. As the court in *Khatchadourian* aptly explained, an agency should be encouraged to review records more than once to ensure accurate responses to FOIA requests. 453 F. Supp. 3d at 80. Differences in application of FOIA exemptions are bound to happen when significant numbers of records are reviewed over a year apart. *See id.* Agencies should be able to change their minds about whether information is exempt from disclosure, and how an agency interprets and applies FOIA exemptions is likely to change over long periods of time. *See id.* (concluding evidence FOIA exemptions were applied differently to the same documents three years apart was "insufficient to show bad faith").

As for Holzer's declaration, a comparison of the 2013 and 2019 versions of the US-VISIT Secondary Inspection Tool Report about Muñoz suggests that they are merely similar documents, not the *same* document. For instance, the 2013 release is ten pages, two pages longer than the 2019 release. In addition, the two documents do not match up page-for-page. Although the two documents appear to contain some of the same information, it is not clear that the *same* information was inconsistently redacted. Even assuming *arguendo* that some of the information released in 2013 was redacted in 2019, six years later, these inconsistencies by themselves are insufficient to rebut the presumption of good faith Holzer's declaration is otherwise entitled to. For instance, the plaintiffs have not presented any evidence that casts doubt on the correctness of the 2019 redactions.

Turning to Pineiro's declaration, the plaintiffs do not dispute that ICE's fourth and final (March 23, 2021) production of the 26 pages of Machado's alien file released all information that was inconsistently withheld in prior productions. Pineiro acknowledged the inconsistencies between the first (February 18, 2020) and third (December 30, 2020) production and explained they were due to two different FOIA analysts reaching different conclusions and that, after another review, the final (March 23, 2021) production contained the fewest withholdings and released the most information possible.

Pineiro's explanation presents a classic example of an agency changing its mind about what is properly exempt under FOIA upon subsequent review and correcting its mistakes. The plaintiffs' suggestion that ICE's later FOIA analysts were motivated *by the pending litigation* to withhold more information is pure speculation, which is insufficient to overcome the presumption of good faith. *See SafeCard Servs.*, 926 F.2d at 1200-01. It also makes little sense. If anything, an agency would be careful to produce as much as legally possible, not to over-withhold, once it was aware there would be judicial scrutiny. Our ruling here incentivizes the government to do just that.

The plaintiffs seize on the fact that Pineiro's declaration failed to mention the second (June 9, 2020) production. But as they concede, the second (June 9, 2020) and third (December 30, 2020) productions withheld the *same* information. Indeed, the two productions are almost identical. The plaintiffs speculate that

Pineiro *deliberately* omitted the second production from his declaration, but Pineiro had no reason to do so when the second and third productions were virtually the same and the fourth (March 23, 2021) production corrected any earlier inconsistencies. Under the factual circumstances here, Pineiro's omission of one of the four productions is insufficient to show bad faith on the part of ICE. *See DiBacco v. U.S. Army*, 795 F.3d 178, 193 (D.C. Cir. 2015) (concluding an agency's omission from a declaration of one date among three of a phased transfer of documents to the National Archives was "insufficient to suggest bad faith or dissembling").

## V. ADEQUACY OF OBIM'S SEARCHES

The plaintiffs challenge the adequacy of OBIM's searches in response to their requests. Those requests sought all information about Machado and Muñoz "located in [IDENT], [ADIS], and other OBIM systems." The requests were accompanied by fingerprint cards that OBIM used to search IDENT for responsive records. For Muñoz, OBIM found the eight-page US-VISIT Secondary Inspection Tool Report (discussed above). For Machado, OBIM found no records.

An agency must make "reasonable efforts to search for the records" identified in a FOIA request. 5 U.S.C. § 552(a)(3)(C). The agency bears the burden of showing the search was "reasonable." *Broward Bulldog*, 939 F.3d at 1176. To do so, the agency must demonstrate "beyond a material doubt" that it conducted a search that was "reasonably calculated to uncover all relevant documents," but the agency is not required to show its search was

exhaustive. *Id.* at 1174, 1176 (quotation marks omitted); *Miccosukee Tribe*, 516 F.3d at 1257 (noting a search need not be perfect to be reasonable under FOIA). The agency need not "account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found." *Broward Bulldog*, 939 F.3d at 1176 (quotation marks omitted). If the agency carries its burden, "the burden shifts to the requester to rebut the agency's evidence by showing that the search was not reasonable or was not conducted in good faith." *Id.* (quotation marks omitted).

Here, the plaintiffs argue OBIM's searches were inadequate for two reasons: (1) as to the IDENT system, OBIM did not search by Machado's alien number in addition to his fingerprints, and (2) as to ADIS, which OBIM did not own or maintain, OBIM failed to refer the requests to another DHS component, Customs and Border Protection ("CBP"), to search ADIS. We explain why both claims lack merit.

## A.    Fingerprint Search in IDENT

As to the request for information in IDENT about Machado, the plaintiffs contend that because OBIM "*can* search using both fingerprints and alien numbers," it should have done so here, especially once no records were located using fingerprints. Once OBIM became "aware of Machado's alien number" during this litigation, the plaintiffs argue OBIM should have run another search using alien numbers.

In response, the government relies on Holzer's declaration, which is entitled to a presumption of good faith. Holzer's declaration explained that "the practice of OBIM [is] to search for records in IDENT using fingerprint cards where available," and that such a search "will result in the location of any records relating to a subject in IDENT." Holzer acknowledged that OBIM also is able to use an alien identification number to locate records in IDENT but stated that such a search "would locate the same records" as a fingerprint search.

Holzer's declaration carries the government's burden to show that OBIM's fingerprint search was "reasonably calculated to uncover all relevant documents" in IDENT about Machado. *See id.* (quotation marks omitted) The plaintiffs contend, without citing any evidence, that not *"every single* database entry" will contain *"both* a valid, searchable fingerprint and an alien number." OBIM, however, is not required to perform an exhaustive search, only a reasonable one, and Holzer's declaration establishes that it did so. *See id.*; *Miccosukee Tribe*, 516 F.3d at 1257.

In the same vein, the plaintiffs claim Holzer's statement that either search method locates the same records is "conclusory," but Holzer's averment is a statement of fact, not a conclusion. A conclusory declaration is one that "merely recite[s] statutory standards" or is "overly vague or sweeping." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). But a "relatively detailed" declaration is sufficient. *Broward Bulldog*, 939 F.3d at 1176 (quotation marks omitted). Here, Holzer's declaration was

relatively detailed, described the mechanism of a fingerprint search, and explained how a "search conducted using fingerprint cards will result in the location of any records relating to a subject in IDENT." After the filing of this action, OBIM even reconducted its fingerprint search to ensure that its initial response was correct, and the result was the same, with no additional records located. We conclude OBIM's fingerprint search in the IDENT system alone was "reasonably calculated to uncover all relevant documents," and OBIM was not required to conduct an alien number search. *See Miccosukee Tribe*, 516 F.3d at 1248 (quotation marks omitted).

Notably too, the plaintiffs' request itself did not explicitly ask for an alien number search. The plaintiffs submitted a fingerprint card for Machado so that OBIM could search their IDENT system, which OBIM then did. OBIM was not required to look beyond the four corners of the request. *See Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996). As the district court noted, the plaintiffs have not cited any authority imposing an additional burden on OBIM in responding to the plaintiffs' request given that it was accompanied only by a fingerprint card. ]

Switching gears, the plaintiffs assert that Machado's alien number, once known to the government, was "a lead so apparent" that OBIM was required to pursue it. *See id.* (stating that an agency "is not required to speculate about potential leads" but the agency may not ignore "a lead so apparent that [the agency] cannot in good faith fail to pursue it"). We disagree. If a search using an alien

number will produce the *same* documents as a search using fingerprints, the alien number is not a "lead" likely to uncover additional responsive documents.

The plaintiffs also argue OBIM's fingerprint search must have been inadequate because it is "inherently unbelievable" that the IDENT system would have no documents about Machado, who was a U.S. visa holder at one time. But OBIM did not have to "account for documents" the plaintiffs believe must exist so long as it "has made a diligent search for those documents in the places in which they might be expected to be found." *See Broward Bulldog*, 939 F.3d at 1176, 1178; *SafeCard Servs.*, 926 F.2d at 1201 ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."). Even though no records were found, the search was adequate because the fingerprint search OBIM conducted was reasonably calculated to uncover all relevant records relating to Machado in IDENT.

## B.    Failure to Route Requests to CBP

The plaintiffs maintain that OBIM's searches were inadequate because OBIM, a DHS component, failed to comply with 6 C.F.R. § 5.4(c) and route their requests for information about Machado and Muñoz to CBP, another DHS component, to search ADIS.

At the time of the plaintiffs' requests, § 5.4(c) provided that a DHS component's FOIA office shall route requests that it

determines were "misdirected" to "the FOIA office of the proper component(s)," as follows:

> (c) Re-routing of misdirected requests. Where a component's FOIA office determines that a request was *misdirected within DHS*, the receiving component's FOIA office shall route the request to the FOIA office of the proper component(s).

6 C.F.R. § 5.4(c) (2018) (emphasis added).

It is undisputed that the record requests at issue in Counts 1 and 2 were directed only to OBIM and sought "all information located in" the IDENT, ADIS, "and other OBIM systems about" Machado and Muñoz. According to Holzer's declaration, ADIS is not an OBIM system but is owned and maintained by CBP.[9] OBIM thus could not conduct a search of ADIS for responsive records. OBIM notified the plaintiff requesters of this fact and that "any requests for ADIS records needed to be sent to CBP." The question here is whether OBIM was also required to route the plaintiffs' request to CBP.

This calls for us to interpret the meaning of "misdirected" requests in § 5.4(c). In interpreting the meaning of a regulation, we

---

[9] Holzer explained the difference between IDENT and ADIS. IDENT is the central DHS-wide system for storing and processing biometric and biographical information for many different purposes, including, among others, immigration, national security, law enforcement, and background investigations. CBP's ADIS system "consolidates data from a variety of systems to create a unique person-centric record with complete travel history."

begin with its text, examining the language within the entire regulatory context. *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1310 (11th Cir. 2024). If the regulation does not define a word, we look to its plain and ordinary meaning. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1214 (11th Cir. 2008).

At the time of the requests, § 5.4(c) did not define "misdirected." Ordinarily something is "misdirected" if it is sent to the wrong address or destination. *See Misdirected*, *Oxford English Dictionary Online*, https://perma.cc/W87P-SU7A ("[S]ent to a wrong destination."); *Misdirect*, *American Heritage Dictionary of the English Language Online*, https://perma.cc/PRD6-4KLG ("To put a wrong address on (a piece of mail)."). In other words, a "request" is "misdirected" if it is sent to the wrong DHS component, that is, a DHS component that does not have, or cannot search for, the requested records. Here, though, OBIM had the IDENT system, maintained records responsive to the plaintiffs' requests, and searched that IDENT system. The plaintiffs' requests were not misdirected to OBIM.

This understanding—that a request is "misdirected" only if the receiving DHS component maintains none of the records sought—is supported by context from neighboring provisions. Section 5.4(c)'s requirement to "route" a "misdirected" request to another DHS component is an exception to the general duty in § 5.4(a) to respond to requests. *See* 6 C.F.R. § 5.4(a). Under that provision, a DHS component is "responsible for responding" to a request for records that it "maintains," "[e]xcept in the instances

described in paragraphs (c) and (d)." *Id.* In turn, § 5.4(c) requires the component to "route" a request it determines is "misdirected" to the "proper" component. *Id.* § 5.4(c). Together, these two provisions establish a binary—the DHS component either has the responsibility to respond to a request under the general rule or it must route the request to the proper component.

Section 5.4(d) also suggests a DHS component has the responsibility to route only *entire* requests, not parts, under § 5.4(c). Section 5.4(d) creates the other exception to § 5.4(a)'s general rule that a component should respond to a request—when the DHS component "maintains responsive records" but those records originated with another DHS component or another DHS component has a "substantial interest" in the information contained in those records. *Id.* § 5.4(d). In these situations, the receiving DHS component has several options, one of which is to "refer the responsibility for responding to the request or [a] portion of the request" to the other DHS component. *Id.* § 5.4(d)(3). When the receiving DHS component "refers any part of the responsibility for responding to a request" to another DHS component, it must notify the requester. *Id.* § 5.4(f).

Section 5.4(d)'s express recognition of partial referrals to other DHS components contrasts with § 5.4(c)'s silence about the need to partially route a misdirected request to another DHS component. We presume a different meaning when one provision addresses an issue on which another provision is silent. *See MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1321 (11th Cir. 2019);

*Assa'ad v. U.S. Att'y Gen.*, 332 F.3d 1321, 1331 (11th Cir. 2003) (applying the principle that when Congress addresses an issue in one provision of a statute and is silent on that issue in another provision it is presumed to be intentional). If § 5.4(c) required the receiving DHS component to route only part of a misdirected request to another DHS component, it would have addressed this possibility explicitly, as was done in § 5.4(d). That § 5.4(c) does not do so suggests that a "misdirected" request is not a request that requires only partial routing to another DHS component.

We are not persuaded by the plaintiffs' argument that § 5.4(c) covers *partially misdirected requests* because it permits DHS components to route a misdirected request to multiple "component(s)." To be sure, under § 5.4(c) the receiving DHS component can route a misdirected request to more than one other DHS component. That a request might be correctly addressed to multiple DHS components sheds no light on whether it was "misdirected" in the first place. For example, a request sent to Component A that is misdirected because it seeks information maintained only by Components B and C would require Component A to route the misdirected request to both Component B and Component C. So, § 5.4(c)'s use of "component(s)" does not undermine the plain language and regulatory context that indicates that only requests to a DHS component that maintains none of the records sought are misdirected.

Finally, we note that a recent clarifying amendment to § 5.4(c) also supports our interpretation of that provision. In February 2024, DHS amended § 5.4(c) to, *inter alia*, specifically provide that a request is not "misdirected" if the receiving DHS component "may maintain" responsive records and the receiving DHS component is not obligated to forward such a request to other DHS components. *See* 6 C.F.R. § 5.4(c) ("A request is not a misdirected request if the receiving DHS component may maintain records responsive to any portion of the request" and "is not obligated to forward to other DHS components that may maintain responsive records unless those other DHS components are explicitly listed in the request."); 89 Fed. Reg. 14369, 14369 (Feb. 27, 2024) (explaining that the rule change was "to clarify when and how a misdirected request should be forwarded").

The requests were not "misdirected" within the meaning of § 5.4(c) because the plaintiffs' requests for information about Machado and Muñoz in the IDENT and ADIS systems were directed to OBIM and OBIM was able to search the IDENT system for responsive records. OBIM had a duty under § 5.4(a) to search IDENT for responsive records, which it did. OBIM was not required by § 5.4(c) to also route the request to CBP. And OBIM did not violate § 5.4(c) by instead notifying the requesters that they needed to submit a separate request directly to CBP to obtain information about Machado and Muñoz in the ADIS system. In sum, the plaintiffs failed to show OBIM's searches were not reasonable. *See Broward Bulldog*, 939 F.3d at 1176.

## VI.  PROPRIETY OF CLAIMED EXEMPTION 3

The plaintiffs argue the government improperly invoked Exemption 3 to withhold and redact documents pertaining to visa *revocations*.[10]

"An agency *must* disclose agency records to any person under § 552(a) *unless* they may be withheld pursuant to one of the nine enumerated exemptions listed in § 552(b)." *Sikes*, 896 F.3d at 1234 (alteration and quotation marks omitted).  We presume responsive records are subject to disclosure unless the agency affirmatively establishes that they fall within one of the nine exemptions. *Broward Bulldog*, 939 F.3d at 1175.  The agency "has the burden of proving that it properly invoked any FOIA exemptions when it decided to withhold information." *Miccosukee Tribe*, 516 F.3d at 1258.  This appeal involves only Exemption 3.[11]

---

[10] The government invoked Exemption 3 as to the plaintiffs' requests at issue in Counts 1 and 2 (OBIM), Count 4 (USCIS), and Counts 7, 8 and 10 (State Department).

[11] On appeal, the plaintiffs also challenge the State Department's withholding of information about Muñoz related to Count 8 under FOIA Exemption 5.  As confirmed in Stein's declarations, however, all of the information pertaining to Muñoz that the State Department withheld under Exemption 5 were visa-related records also subject to non-disclosure under Exemption 3.  Because we agree with the district court that the agencies properly relied on Exemption 3, we need not, and do not, address the plaintiffs' arguments about Exemption 5.

Exemption 3 permits an agency to withhold information "specifically exempted from disclosure by statute" if the relevant statute either:

> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; *or*
>
> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3)(A)(i)-(ii) (emphasis added).

To successfully claim Exemption 3, the agency must show: "(1) the statute invoked qualifies as an Exemption 3 withholding statute" under either subclause (A)(i) or (A)(ii); *and* (2) "the materials withheld fall within that statute's scope." *Spadaro v. U.S. Customs & Border Prot.*, 978 F.3d 34, 42 (2d Cir. 2020) (alteration adopted, quotation marks omitted); *see also CIA v. Sims*, 471 U.S. 159, 168-69 (1985).

The withholding statute the agencies invoked is INA § 222(f), 8 U.S.C. § 1202(f). That statutory provision makes "confidential" records "pertaining to the issuance or refusal of visas," as follows:

> The records of the Department of State and of diplomatic and consular offices of the United States *pertaining to the issuance or refusal of visas or permits to enter the United States* shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the

immigration, nationality, and other laws of the
United States . . . .

8 U.S.C. § 1202(f) (emphasis added).[12]

We readily conclude that INA § 222(f) is a withholding
statute under Exemption 3. At least four of our sister circuits have
held that § 222(f) qualifies as a withholding statute under 5 U.S.C.
§ 552(b)(3)(A). *See Spadaro*, 978 F.3d at 46; *Wiener v. FBI*, 943 F.2d
972, 982 (9th Cir. 1991); *Medina-Hincapie v. Dep't of State*, 700 F.2d
737, 740-43 (D.C. Cir. 1983); *De Laurentiis v. Haig*, 686 F.2d 192, 193
(3d Cir. 1982).

We now join these circuits. In fact, we conclude that § 222(f)
is a withholding statute under both subclauses of § 552(b)(3)(A).
That is, § 222(f) satisfies subclause (A)(i) because it leaves the
Secretary of State with no discretion to disclose material to the
public. *Medina-Hincapie*, 700 F.3d at 741-42 ("[T]he confidentiality
mandate is absolute."). Section 222(f) also satisfies subclause (A)(ii)
because it "refers to particular types of matters to be withheld,"
that is, records pertaining to the issuance and refusals of visas.
*Spadaro*, 978 F.3d at 43; *De Laurentiis*, 686 F.2d at 193 ("This
category of information is sufficiently delimited to fit within the
statutory language.").

---

[12] Section 222(f) contains exceptions for certain records, but there is no
argument that the records at issue here fall within any of these exceptions. *See*
8 U.S.C. § 1202(f)(1)-(2).

Having determined that § 222(f) is a withholding statute, the next question is whether visa revocation records fall within the scope of § 222(f). If they do, then the agencies properly withheld them.

Section 222(f) covers records "pertaining to the issuance or refusal of visas." As with regulations, we start with a statute's plain text to determine its meaning. *Gose*, 109 F.4th at 1310. Generally, "pertain" is defined as related to or connected to. *See Pertain, Black's Law Dictionary* (12th ed. 2024) ("To relate directly to; to concern or have to do with."); *Pertain, Oxford English Dictionary Online*, https://perma.cc/E8NQ-AVD8 ("To belong" or "be connected *to* (something), esp. as a part of a whole, or as an appendage or accessory," and "[t]o relate to; to refer to."); *Pertain, American Heritage Dictionary of the English Language Online*, https://perma.cc/E57N-947F ("To have reference or relevance; relate."). Section 222(f) thus applies to records that relate to or are connected to the issuance or refusal of a visa.

The phrase "pertaining to," like the phrase "relating to," is deliberately expansive and gives a statute a broad sweep. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (concluding the use of the phrase "relating to"—which means "to pertain"—gave an ERISA provision a broad scope for preemption purposes). While § 222(f) explicitly refers to the "issuance" and the "refusal" of a visa, the presence of the phrase "pertaining to" indicates the statute is not limited only to records issuing and refusing a visa. If a record relates to the issuance or refusal of a visa,

even if it is not itself a record of an issuance or refusal, § 222(f) makes that record confidential.

The only circuit to have addressed whether § 222(f)'s scope is broad enough to encompass visa revocation records has concluded that it is. In *Spadaro*, the Second Circuit held that documents that "relate solely to the revocation of a visa 'pertain[] to the issuance or refusal of visas or permits to enter the United States' and thus fall within the ambit of INA § 222(f)." 978 F.3d at 45 (alteration in original). Examining § 222(f)'s "plain language," the Second Circuit concluded the use of the "broad phrase" *pertaining to* made it "clear that the revocation of a visa pertains to the issuance of a visa because they are so closely related – namely, a revocation constitutes a nullification of that issuance." *Id.* at 46. The Second Circuit observed that "a visa can never be revoked without first being issued" and that "the issuance and revocation of visas represent two sides of the same coin." *Id.* (quotation marks omitted). As an analogous example, the Second Circuit explained that a refund receipt would be a document "pertaining to" the purchase of a product. *Id.*

The Second Circuit's *Spadaro* reasoning is persuasive. We agree that records about a visa's revocation "pertain[] to" both the visa's issuance and its ultimate refusal. A visa's issuance and revocation are closely related because the revocation follows from the Secretary's decision to reconsider the visa's issuance, often because new information or changed circumstances may have rendered the initial justification for issuing the visa unsound. The

revocation constitutes a nullification of the "issuance." The visa's revocation also constitutes a form of "refusal" upon that reconsideration. Accordingly, visa revocation records unambiguously fall within the "pertaining to" scope of § 222(f) and must be kept confidential.

The plaintiffs' reliance on the canon of construction *expressio unius est exclusio alterius*—the expression of one thing implies the exclusion of another—is misplaced for two related reasons. First, the *expressio unius* canon "depends on context" and "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (alteration adopted, quotation marks omitted); *Fedance v. Harris*, 1 F.4th 1278, 1286 (11th Cir. 2021); *United States v. Castro*, 837 F.2d 441, 442-43 (11th Cir. 1988). The presence of the broadening phrase "pertaining to" clearly indicates Congress's intent that the statute cover *more than* just records of issuances and refusals of visas. Therefore, § 222(f)'s specific reference to "issuance" and "refusal" cannot be read as exclusive.

Second, because the statute's plain text is clear that it applies to visa revocation records, we have no reason to apply the *expressio unius* canon. *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 n.6 (11th Cir. 2001) (explaining that a statute's plain meaning "often vitiates the need to consider any of the other canons"); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997) ("When the words of a statute are unambiguous, then, this first canon of statutory construction is also the last: judicial inquiry

is complete.") (alterations adopted) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).[13]

Our interpretation does not violate the rule that we must construe FOIA exemptions narrowly. *See News-Press*, 489 F.3d at 1191. For starters, § 222(f) is part of the INA, not of FOIA. In any event, the plain meaning of § 222(f) requires visa revocation records to be kept confidential. When the statute is clear, our analysis ends with its plain text. *Soul Quest Church of Mother Earth, Inc. v. Att'y Gen.*, 92 F.4th 953, 965 (11th Cir. 2023) ("[I]f the language at issue has a plain and unambiguous meaning, that meaning controls, and the inquiry ends."); *Merritt*, 120 F.3d at 1186.

Because § 222(f) is a withholding statute under Exemption 3 that makes visa revocation records confidential, we agree with the district court that the government properly withheld information about the revocation of Machado's, Muñoz's, and Vásquez's visas in response to the plaintiffs' record requests.

---

[13] While not necessary to our analysis, we note that § 221 of the INA, entitled "Issuance of visas," confers the powers to both issue visas and revoke them, offering further support for the conclusion that the two powers are closely related. *See* INA § 221(a), (i). As the Second Circuit stated, § 222(f)'s application to visa revocations "is certainly buttressed by the fact that Congress used the title 'Issuance of visas' to cover not just the initial issuance of the visa, but also intertwined acts such as visa renewals, non-issuances, and revocations." *Spadaro*, 978 F.3d at 47; *see also Castro*, 837 F.2d at 442 n.1 (noting that statutory headings "can serve as limited interpretive aids if the statute itself is ambiguous").

## VII.  CONCLUSION

For all these reasons, we affirm the district court's order granting the government defendants' motion for summary judgment and denying the plaintiffs' cross-motion for summary judgment.

**AFFIRMED.**